Victor **BEVEVINO**, Appellee,

v.

M. S. **SAYDJARI**, Appellant.

No. 474, Docket 77–7466.

United States Court of Appeals, Second Circuit.

Argued Jan. 11, 1978.

Decided April 5, 1978.

Arthur N. Seiff, New York City (Anthony L. Schiavetti, Benjamin Vinar, New York City, of counsel), for appellant.

Gerald Orseck, Liberty, N.Y., for appellee.

* Of the Southern District of New York, sitting by designation.

Before FEINBERG and OAKES, Circuit Judges, and WYATT, District Judge.*

OAKES, Circuit Judge:

This appeal is from a $550,000 judgment for the plaintiff rendered in the United States District Court for the Southern District of New York, Whitman Knapp, Judge.[1] The jury awarded medical malpractice damages to Victor Bevevino who lost his right eye soon after an automobile crash. The district court denied appellant's motions for a directed verdict and for judgment notwithstanding the verdict or for a new trial.

Appellant, a general surgeon, asserts four grounds for reversal. First, he urges that judgment notwithstanding the verdict should have been granted because (a) there was no basis in the record for finding him negligent since he was not an eye specialist and since he did not countermand the directions of the specialist who examined appellee's eye; and (b) there was no proof of a causal connection between his alleged negligence and appellee's injury. Second, he asserts that the district court committed reversible error and abused its discretion in denying the new trial motion because (a) Judge Knapp found that the verdict was against the clear weight of the evidence, but (b) refused to set it aside solely to penalize appellant's insurer for providing an inadequate defense. Third, appellant contends that it was reversible error to permit the jury to consider evidence of his own bad eyesight. Finally, he argues that the jury's award was grossly excessive.

Having carefully reviewed the evidence in the light most favorable to appellee with respect to the motion for judgment notwithstanding the verdict, see 5A *Moore's Federal Practice* ¶ 50.07[2], at 50–79–50–83 (2d ed. 1977), and having given the discretionary judgment of the trial court the benefit of the doubt with respect to the new

1. Jurisdiction was premised on diversity of citizenship. 28 U.S.C. § 1332.

trial motion, see 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2803, at 32–33, § 2818, at 118, § 2819, at 127, § 2820, at 129–32 (1973), we find none of appellant's contentions persuasive. We therefore affirm the judgment below.

## I. FACTS

Victor Bevevino was born in Brazil in 1938, attended school through the eleventh year and at one time played professional soccer.[2] In 1973 he was working as a waiter at the Grossinger Hotel in Sullivan County, New York. While he was returning home from the Monticello Raceway late in the evening of June 16, 1973, an automobile in which he was a passenger struck a tree, causing injury to his right eye, broken ribs, a punctured lung and a fractured spine. Taken by ambulance to the Community General Hospital (Community General) in Liberty, New York, in the early morning hours of June 17, he was first treated in the emergency room by appellant who was "on call." Bevevino was then moved to the intensive care unit.

The picture of appellee's injuries when he arrived at Community General and of the emergency treatment provided by Dr. Saydjari is somewhat obscure.[3] The record becomes clearer after Bevevino was admitted to intensive care. Barbara Hamilton, a registered nurse in charge of the intensive care unit on the morning of June 17, testified that appellee complained of pain in his eye and back and that he was given medication for the pain. She independently recalled the condition of appellee's right eye because "[i]t looked a little grotesque." He had a laceration near his right eye which had been sutured in the emergency room, appar-

ently by Dr. Saydjari. The eye was "ecchymotic[4] and edematous,"[5] and had "blood coming from between the lids," that is, from under the eyelids. Moreover, "the upper lid was inverted so that the inside of the lid was showing."

When Bevevino was transferred to intensive care, appellant ordered the eye covered with saline compresses to prevent infection from debris or foreign matter. Dr. Saydjari also requested an ophthalmologic consultation, suggesting a Dr. Spivak. Because appellant did not order an immediate consultation, Ms. Hamilton instructed the 7 a. m. shift to arrange for a specialist. Dr. Spivak never saw appellee; Nurse Hamilton did not know whether anyone had attempted to contact him. She testified, however, that appellant, as Bevevino's attending physician, was responsible for following up on any consultation ordered.

Dr. Schwab, an internist, examined appellee at 3 p. m. on June 18, at Dr. Saydjari's request.[6] According to the intensive care records, Dr. Schwab asked that Dr. Nemerson, an ophthalmologist, be called in to examine Bevevino's eye. Evidently Dr. Nemerson, who did not examine Bevevino until late in the day on June 18 or early in the morning of June 19,[7] merely prescribed Vaseline gauze dressings. The hospital records indicate that the only care afforded appellee's eye during his six-day stay at the hospital, other than application of Vaseline gauze dressings and saline compresses, was antibiotic treatment pursuant to appellant's order.

Bevevino could not remember many details of his stay at Community General. He recalled complaining of severe pain in his

---

**2.** He testified that he was not playing professional soccer at the time of the accident because he was hoping for a more lucrative offer than he had previously been made.

**3.** Appellant could not independently recall having treated Bevevino. *See* text accompanying notes 8–11 *infra*. The emergency room records were not illuminating.

**4.** Ecchymosis, she accurately explained, "indicates a black and blue situation, bruising, which is blood under the skin."

**5.** She accurately defined edema as "swelling or excessive tissue liquid in the tissue."

**6.** There was no consultation with an ophthalmologist prior to Dr. Schwab's examination.

**7.** Nurse Hamilton's records reveal that the examination was conducted at 8 a. m. on June 19. However, the consultation report is dated June 18.

eye whenever he was awake, receiving visits from friends each day, and being fed intravenously. He also remembered that on June 22 he implored David Cohen, his lawyer, to remove him to another hospital because the pain in his eye was intensifying. Appellee testified: "I asked him to help me. I was scared. There was a lot of pain. I thought I was in trouble. I asked him to take me from there because if I stay one more day, I no make it. I told him."

A Brazilian friend of Bevevino, Mr. Santos, visited appellee on each of the first five days of his hospitalization at Community General. The thrust of Santos' testimony was that on June 20, three days before Bevevino left the hospital, appellee had vision in his injured eye. When Santos saw a nurse remove the patch from Bevevino's right eye, he asked Bevevino: "Will you close your left eye and look and see if you see anything here?" Bevevino complied, and reported that he saw Santos' hand but not his fingers, and that it was "hard" to see.

Appellant, Mohammed Saydjari, was a general surgeon who immigrated to the United States in 1953.[8] An eye problem forced him to retire from medial practice in February, 1974.[9] Appellant claimed no independent recollection of having examined or treated Bevevino, and did not know which of the latter's eyes was injured. His recorded description of the eye injury referred to "[e]cchymosis, edema, redness and bulging of the conjunctiva." It said nothing about the laceration near the eye, which he sutured in the emergency room. Dr. Saydjari reiterated on several occasions that not only did he fail to recognize that Bevevino had a serious injury to his right eye, but that "[he] would have known nothing about the eye," because it was "out of [his] speciality." Yet he also testified that he was aware of the gravity of the eye injury. While portions of his testimony conflicted as to what he had or had not done, it is fairly clear that he did not look inside the eye and made no tests to determine Bevevino's ability to see.

Dr. Saydjari also testified that he called in three ophthalmologists, Drs. Spivak, Nemerson and Fisher. However, the hospital record indicates that neither Spivak nor Fisher ever consulted on the Bevevino case. Despite the conflict between the doctor's testimony and the hospital records, it is again quite evident that the only eye specialist who saw Bevevino was Dr. Nemerson.

Appellant further explained that he usually did not speak personally with consulting doctors. Rather, after consultants examined a patient, they would leave a report or note. When asked to read Dr. Nemerson's "report," [10] appellant could decipher only a few words of the handwriting. Immediately thereafter he independently recalled a conversation with Dr. Nemerson who, according to Dr. Saydjari, told him

"I can't give any opinion unless the swelling goes down so I can look into it. For the time being, I have to get this edema

---

**8.** Dr. Saydjari testified only by deposition.

**9.** More than once during the deposition, Dr. Saydjari repeated that his eye disability occurred suddenly, several weeks before his retirement in 1974. He also testified that the cause of his disability and retirement was a cataract, in his right eye; his left eye was purportedly "fine." Appellee introduced documentary evidence—disability insurance applications and reports—which undeniably demonstrated that Dr. Saydjari's eye difficulties dated from June, 1972, when he was hospitalized for his eye condition, and that he had been under constant medical treatment for his eyes since that time. Additionally, in some of the documents, appellant represented that because his sight was impaired in both eyes he could not perform his job properly. And Nurse Hamilton recalled that on several occasions she observed appellant bend down closer to a wound he was suturing than other surgeons normally do.

**10.** The Nemerson consultation stated in its entirety that there were

[l]acerations of brow over the nose [illegible]; right [illegible] has a retro bulbar hemorrhage; lower bulbar conjunctiva is pushed out across eyelid [illegible] by the deep subconjunctival hemorrhage. Pupil is small, cornea is clear. Prognosis guarded. Diagnosis: retro bublar hemorrhage. Recommendations: sterile vaseline to cover the inverted conjunctiva.

Dr. Nemerson was deceased at the time of trial.

down and then I will examine it, as soon as the edema subsides," and that he would be following up, waiting for the right moment to look inside the eye. Dr. Nemerson, however, did not return to the hospital during the remainder of appellee's stay.[11]

Appellee's lawyer at the time, David Cohen, visited Bevevino on June 22 to discuss legal matters. In response to appellee's mounting complaints that his eye was hurting him terribly and that he feared loss of his vision, Mr. Cohen telephoned Dr. Saydjari to inform him of Bevevino's discomfort and to determine the condition of the eye. Cohen testified that the doctor replied: "Don't worry about it. He will be fine. His eye is being taken care of." The attorney asked Saydjari what was being done, and in particular whether an eye specialist had been contacted. Appellant replied that he "assume[d] an eye doctor came because [he] left orders for him to come." But after appellee cried for help, Cohen arranged Bevevino's transfer to Horton Memorial Hospital (Horton) in Middletown, New York, some thirty miles away. Dr. Saydjari advised against the transfer.

Two hours after admission to Horton on the evening of June 22, Bevevino was examined by Dr. Kenneth Adams, an ophthalmologist, who observed the sutured lacerations on Bevevino's right upper eyelid and "a good deal of swelling." Bevevino was in pain and "not in very good shape." Dr. Adams diagnosed that Bevevino had some vision during the first examination in the form of light perception, but he did not think that the eyesight could be saved at that time. Nor did he believe that prompt action immediately after the accident could have saved Bevevino's vision in the damaged eye. Explaining that a pathological report conducted after he removed the eye revealed that the retina was partially outside of the eye, Dr. Adams testified that "the chance of visual saving of the eye is pretty small—virtually nil" when the retina is prolapsed. However, he conceded that exerting pressure on the lacerated eye by applying compresses or by allowing the uninjured eye to move (with concomitant movement of the injured eye) could have resulted in forcing matter, including the retina, through the laceration.

He could not say with certainty whether the eyeball might have been saved by proper treatment.[12] In his opinion the prognosis was poor. However, he "would have probably sewed up the eye [on the night of the accident] and not taken it out." Then he would have waited three weeks to determine whether the eye could have remained intact.

Dr. Adams further testified that both Drs. Nemerson and Saydjari were at fault in not giving the eye more attention. He criticized Dr. Nemerson's report for being a "short note" rather than a "full consult." In addition, it appeared that only an external eye examination had been conducted. Although Dr. Adams did not believe that a general surgeon was qualified to give the eye thorough treatment, he considered that an inverted conjunctiva, noted in appellant's record, should have put Dr. Saydjari

11. Nurse Hamilton testified that at Memorial General the attending physician is responsible for following up on any consultant called in.

12. A letter dated September 18, 1976, from Dr. Adams to appellee's attorney suggested improper care at Community General. It stated:

It was my considered medical opinion as well as that of a colleague who saw him that this was an irreparably damaged right eye.

The pathology report confirms this. The visual prognosis for this eye was NIL in our opinion. The collapsed eye was therefore removed in order to protect the fellow eye from serious sympathetic ophthalmic problems.

I do not know the condition of the eye at the time of accident as I did not see him until 6/22/73.

Had there been no retinal prolapse, no signs of infection etc. then perhaps the prognosis would have been better but this is only conjecture. Certainly the fact that the wound was open for 5 days before being considered did not help his prognosis.

Additionally, Dr. Adams' report of the enucleation stated: "This eye [was] obviously an eye that had to be removed and it was not reparable being a one week old wound before the eye was even seen."

on notice that the eye needed special attention. He also criticized Dr. Saydjari for not at least asking Dr. Nemerson to elaborate on why his prognosis was "guarded," see note 10 supra, after Dr. Saydjari received the incomplete report. He also thought that appellant was remiss in not "follow[ing] up more" when Dr. Nemerson failed to return to the hospital.

Within two days of Bevevino's admission to Horton, the light perception previously noted by Dr. Adams had vanished. Thereafter, Dr. Adams and another specialist determined that the eye had to be removed, and it was.[13] He believed that had the eye not been removed within two to three weeks of the injury, the other eye would have been damaged as well. See note 12 supra.

Appellee's expert ophthalmologist, Dr. Henry T. Gaynin, did not agree with Dr. Adams that the vision was probably lost at the time of the accident. Dr. Gaynin concluded that in a considerable percentage of injuries as bad as or even worse than Bevevino's prompt treatment had produced useful vision. He did not find the pathology report helpful in determining whether appellee's vision was lost during the accident because it depicted the eye's condition days after removal and more than one week after the accident. The report merely revealed that the retinal detachment was caused by bleeding. The doctor explained that pressure from the compresses, eye movement, or even Dr. Adams' surgery could have produced the detachment. He further elucidated:

> If that eye had a degree of vision right after that injury occurred, before the adverse action took place as a result of the way the eye was treated in Community General Hospital, then I would not write off the opportunity or chance to save the vision of that eye. I cannot say it would be 20/20, 20/40, but there was an opportunity to save some degree of vision in that eye.

Dr. Gaynin's view that the eyeball could have been saved by proper treatment was reinforced by the location of the eyeball laceration. Like Dr. Adams, Dr. Gaynin would have operated on the eye and sutured the laceration at the back side of the eyeball immediately upon examining the eye on the night of the accident.

Dr. Gaynin agreed with Dr. Adams that the treatment at Community General was inadequate. Dr. Gaynin testified that an ordinary unspecialized physician should have recognized the gravity of the eye injury. Although the admitting records indicated a "very substantial [eye] injury," he could not understand why no treatment of substance was ever rendered to the eye. He described the duties and obligations of an attending physician, whom he characterized as an administrator, responsible for the welfare of the patient as a whole. In particular, Dr. Gaynin stressed the need for always following up on any consultation as well as for obtaining a consultation in this case at the earliest moment.[14] He high-

---

13. Bevevino remained in Horton until August 18, 1973. A few months after his discharge he was fitted with a prosthesis, which must be removed, cleaned and reinserted daily.

14. Dr. Gaynin's report to Bevevino's attorney, which his testimony developed, stated in pertinent part:

> There is no reasonable doubt that the failure to obtain immediate eye consultation at the Community General Hospital of Sullivan County, Liberty Division, was a negligent act and thereby resulted in a condition that led to a development of pathology that necessitated the enucleation of the right eye so that the patient is totally and permanently blind as far as the right eye is concerned; has a serious facial disfigurement as a result of the

removal of the right eyeball with the necessity of wearing a prosthetic for the rest of his life; and he has sustained a loss of binocular vision and depth perception for the rest of his life.

> It is my opinion, based upon a reasonable degree of medical certainty, that the failure and omission on the part of the attending physicians and the staff of the Community General Hospital to examine, diagnose, treat and obtain special consultation with a competent opthalmologist [sic] constituted affirmative acts of negligence and were competent producing cause of the enucleation which was necessitated. The records indicate that the vision of the patient in the injured eye was reduced to light perception and if diagnosed and treated immediately

lighted the obvious gaps in Dr. Nemerson's consultation report—such as the failure to study the inside of the eye and to test the vision and pressure of the eye [15] which prevented Dr. Nemerson from discovering and correcting the laceration behind the eyeball. Dr. Gaynin was convinced that the consultation's "glaring . . . inadequa[cy]" should have been evident to Dr. Saydjari; accordingly, Dr. Saydjari should have contacted another eye doctor qualified to conduct a thorough eye examination.

Dr. Gaynin also stated that there was a failure of judgment on Dr. Saydjari's part either in not transferring Bevevino to a facility where he could get better treatment,[16] or in not obtaining an ophthalmologist immediately. In Dr. Gaynin's view, these omissions, as well as the failure to obtain another ophthalmologist after receiving Dr. Nemerson's report, precluded vision retention and led to deterioration of the eye from lack of treatment.

Appellant's expert, Dr. Herbert Gould, differed in his conclusion, as might be expected; while he believed that the retina was prolapsed and that the vision in Bevevino's eye consequently was lost at the time of the accident, he could not be sure. And he acknowledged the possibility that muscular movement of the uncovered eye, application of compresses, or the suturing of the laceration near the eye in the emergency room could have exerted sufficient pressure to cause the prolapse. However, when asked to explain Bevevino's apparent ability to see his Brazilian friend's hand several days after the accident, he replied that appellee probably imagined vision because of his desire to see. It is significant that Dr. Gould reluctantly agreed with the other doctors that Dr. Nemerson's report was inadequate.

Dr. Bernard Kalina, appellee's very well qualified psychiatrist, testified extensively to the marked change in Bevevino's mental state after the accident. Appellee was unable emotionally to adjust to his injury. Prior to the enucleation, appellee was extroverted, conscientious, enjoyed working, and prided himself on his physical appearance.[17] After the accident Bevevino was depressed to the point of crying every day, withdrawn, fearful of people, unable to interact normally even with his family,[18] unable to sleep and incapable of engaging in ordinary daily activities.[19] He no longer could concentrate, had difficulty in verbalizing his thoughts, and was obsessed with feelings of disfigurement, ugliness, self-deprecation and uselessness.

Appellee's depression deepened over time. Before Bevevino returned to Brazil in 1974,

while at the Community General Hospital, the enucleation would have been avoided and the vision of the damaged eye could have been saved.

15. Contrary to Dr. Saydjari's testimony, Dr. Gaynin did not believe that swelling of the eye had prevented Dr. Nemerson from conducting a complete eye examination. First, he explained that "[i]f the lids were swollen so tight shut that [Dr. Nemerson could not] possibly [have] open[ed] them, for [his] own protection [he would have] put it on the chart." Second, he testified that it was apparent from Dr. Nemerson's consultation report which described the condition of the pupil and cornea, see note 10 supra, that Dr. Nemerson could see and examine the eye.

16. The assistant administrator of Community General testified that patients in need of specialized care were often transferred to hospitals in larger cities with better facilities and larger staffs than those of Community General, a rural hospital.

17. It was stipulated that Ms. Leah Mandell, appellee's supervisor at Grossinger's Hotel, would give similar testimony.

18. Appellee was very close to his family before the accident. The doctor believed that Bevevino's estrangement was caused by his feeling that he had let his family down by no longer providing financial support.

19. Appellee also explained how the loss of his eye changed his lifestyle. He began seeing Dr. Kalina because he was depressed and had lost his self-confidence. He testified that the pain in his eye has continued unceasingly since his discharge from the hospitals. Appellee does not go out with women because "[he] can't look a girl in the face," stays home day and night, and cannot coach soccer. He spills liquids and misses his mouth when trying to eat, has difficulty reading, has nightmares, and is afraid to ride in automobiles.

the psychiatrist diagnosed appellee's mental condition as depressive neurosis. Dr. Kalina was convinced even then that appellee was permanently disabled.[20] The doctor again interviewed Bevevino shortly before trial in 1977. He found that appellee's obsession with his lost eye and his inability to function had exacerbated and that appellee had totally withdrawn from society. In the doctor's opinion, there was even a good chance of suicide. He now characterized appellee's mental condition as psychotic, progressive reaction—a severe type of depression.

## II. DISCUSSION

### A. Judgment Notwithstanding the Verdict.

■ Appellant's contention that judgment notwithstanding the verdict should have been granted on the ground that the verdict was unsupported by evidence of causation or of negligence is without merit.[21] The argument that there was no proof of a causal relation between appellant's negligent conduct and appellee's injury is essentially predicated on two factual claims: (1) that appellee's vision was irreparably lost during the accident and (2) that the eye itself was similarly injured at the time of the accident to the point of requiring removal. The testimony on these factual issues was conflicting, to be sure, but certainly the evidence was sufficient to justify findings favorable to Bevevino.

With regard to the loss of vision, Santos testified that Bevevino could see three days after the accident, and Dr. Adams testified that he "got vision" when he examined Bevevino after the latter's transfer to Horton. Furthermore, the jury could have inferred from the testimony of all three ophthalmologists and in particular from that of Dr. Gaynin that the cause of the prolapsed retina was the pressure from compresses, muscle movements or suturing the wound near the eye, coupled with the failure promptly to treat the eye surgically.

The expert testimony on loss of the eye itself was even less conflicting. Dr. Gaynin was quite certain that the eye could have been saved with proper treatment, including immediate surgery. Although not as confident as Dr. Gaynin, Dr. Adams agreed that he would have operated immediately with the goal of saving the eye. Clearly then, there was sufficient evidence of causation to justify the jury's verdict. See, e. g., Sentilles v. Inter-Caribbean Shipping Corp., 361 U.S. 107, 109–10, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959); Ernest v. Boggs Lake Estates, Inc., 12 N.Y.2d 414, 240 N.Y.S.2d 153, 190 N.E.2d 528 (1963).

Appellant's argument that appellee adduced insufficient proof of negligence, thereby warranting judgment notwithstanding the verdict, is similarly deficient. Although Dr. Saydjari was not an eye specialist, the fact remains that he did not demand an immediate consultation as he should have according to Dr. Gaynin's testimony. Moreover, all experts agree that he should have followed up by calling in another ophthalmologist after receiving the inadequate Nemerson consultation, and that he did not provide adequate treatment. The evidence was abundantly sufficient for the jury to conclude that Dr. Saydjari did not function as a reasonably prudent general surgeon in caring for and treating appellee.

### B. New Trial.

■ Appellant next argues that even if the district court properly refused to grant judgment notwithstanding the verdict, it was an abuse of discretion not to grant a new trial on the ground that the verdict was against the weight of the evidence. Unlike a motion for judgment notwithstanding the verdict, a new trial motion may be granted even if there is substantial evidence to support the verdict. 11 C. Wright & A. Miller, supra, § 2806, at 43.

---

**20.** The doctor has been, among other things, a consultant psychiatrist for the New York State Department of Social Services, Bureau of Disability Determinations, since 1967.

**21.** In fact, the district court characterized the motion as "frivolous." Bevevino v. Saydjari, No. 75 Civ. 2848, 76 F.R.D. 88 at 89 n. 2 (S.D.N.Y., filed Aug. 4, 1977).

The trial judge is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner. *Id.* at 44–45.

Applying these principles to the facts at hand, appellant invokes the district court's statement that

> [t]he basic problem posed by this motion arises from two conclusions at which the court has arrived: *first,* that as a matter of actual fact the finding of liability was altogether unwarranted, but *second,* that on the basis of the testimony adduced at trial the jury was fully justified in making such a finding.

*Bevevino v. Saydjari,* No. 75 Civ. 2848, 76 F.R.D. at 89 (S.D.N.Y. filed Aug. 4, 1977) (emphasis in original). Dr. Saydjari interprets these two conclusions of the court as holding

> that there was, in its opinion, a basis in the evidence on which the jury's verdict could be upheld . . . , but that *in the court's considered opinion the jury was clearly wrong* and its verdict "altogether unwarranted."

Brief for Appellant at 19 (emphasis in original). Accordingly, the argument runs, the trial court abused its discretion when it denied appellant's motion for a new trial after specifically finding the jury's verdict totally unwarranted on the court's perception of the evidence.

■ In our view, Judge Knapp did not exceed the parameters of his discretion in refusing to set aside the verdict as contrary to the weight of the evidence. While different courts have adopted varying standards to be applied by a trial court in passing on such a motion, *see* 11 C. Wright & A. Miller, *supra,* § 2806, at 45–59; C. Wright, *Law of Federal Courts* § 95, at

468–69 (3d ed. 1976), we approve [22] the standard set forth in 6A *Moore's Federal Practice, supra,* ¶ 59.08[5], at 59–160–59–161 (1973) (footnotes omitted):

> The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice. If convinced that there has been then it is his duty to set the verdict aside; otherwise not.

■ If the district court's opinion is studied in its entirety, we do not believe that Judge Knapp considered the verdict erroneous, let alone "seriously erroneous." He denied the motion for a new trial because "the *testimony adduced at trial* . . . fully justified" a jury verdict of liability. *Bevevino v. Saydjari, supra,* No. 75 Civ. 2848, 76 F.R.D. at 89 (emphasis added). The district court did not explicitly state that based on the *evidence presented* it would have reached a contrary verdict. Rather, because of the inadequacy of the defense provided by appellant's insurance company, *see post* at 685; note 27 *infra,* Judge Knapp surmised that with proper legal preparation and presentation of additional evidence—"as a matter of actual fact," *Bevevino v. Saydjari, supra,* No. 75 Civ. 2848, 76 F.R.D. at 89—the verdict might not have been warranted.[23] *See* note 31 *infra.* Under the standard of this court, the judge surely was correct in refusing to set aside a verdict which was fully supported by the evidence actually presented.

---

**22.** *See Compton v. Luckenbach Overseas Corp.,* 425 F.2d 1130, 1133 (2d Cir.), *cert. denied,* 400 U.S. 916, 91 S.Ct. 175, 27 L.Ed.2d 155 (1970).

**23.** Following the passage of the district court opinion quoted *ante* at 684, the paragraph continues:

> The apparent inconsistency of these two conclusions appears to arise out of the circum-

stances that defendant's malpractice insurance carrier, Employer's Insurance of Wausau, deliberately decided not to provide the defendant with the semblance of a defense. In short, it is the court's opinion that the verdict resulted from the carrier's willful default.

*Bevevino v. Saydjari, supra,* No. 75 Civ. 2848, at 89.

However, at one point in the opinion denying the motion for a new trial,[24] and three times in an addendum to the opinion,[25] Judge Knapp arguably states that based on the evidence presented at trial, had he been the fact-finder he would have found for appellant. While we believe that the district court was referring to facts which could have been but were not presented below, we will assume, *arguendo*, that he disagreed with the jury based on the evidence introduced at trial. Nevertheless, we conclude that the district court was not required to grant a new trial simply because he disagreed with the jury. *See* 6A *Moore's Federal Practice, supra,* ¶ 59.08[5], at 59–159; 11 C. Wright & A. Miller, *supra,* § 2806, at 46; C. Wright, *supra,* § 95, at 469.

In *Compton v. Luckenbach Overseas Corp.,* 425 F.2d 1130, 1133 (2d Cir.), *cert. denied,* 400 U.S. 916, 91 S.Ct. 175, 27 L.Ed.2d 155 (1970), a case in a similar posture to this case, the district judge denied a motion for a new trial even though he had "characteriz[ed] the evidence against plaintiff as 'overwhelming' and remark[ed] that as the trier of fact he would have decided the case differently." This court rejected the contention "that because the judge found defendant's evidence 'overwhelming' he was under a positive duty to set the verdict aside." *Id.* at 1132. Judge Knapp, in the ambiguous passages at issue, *see* notes 24–25 *supra,* never concluded that the verdict was "seriously erroneous" or against the weight of the evidence. He did not even find that the evidence actually presented was "overwhelming" for appellant. At most, he stated that he would have interpreted the evidence differently. Thus, under *Compton v. Luckenbach Overseas Corp., supra,* he properly exercised his discretion in refusing to grant a new trial.[26]

Had the trial judge denied the motion solely on the basis that the jury's verdict was justified, despite his disagreement, we would have no difficulty in affirming the ruling below. Appellant, however, makes a more serious contention. He reads the opinion as holding that the only reason for not granting the motion was to punish appellant's malpractice insurance carrier for its shoddy defense.[27] *See* note 23 *supra.*

---

**24.** It states:

Two highly competent ophthalmologists, the one who performed the enucleation and one called as an expert by the defense, gave it as their opinion that the eye had been destroyed at the moment of impact, and was wholly beyond saving when defendant doctor first encountered plaintiff. The contrary testimony of an expert called by plaintiff appeared to us to be equivocal.

Why then, the defendant doctor apparently having saved plaintiff's life and having had nothing to do with the loss of his eye, did the jury award a $550,000 verdict against him? The answer, as we have indicated, is that the defendant's malpractice carrier did not afford him the semblance of a defense.

*Bevevino v. Saydajari, supra,* No. 75 Civ. 2848 at 90.

**25.** In its addendum, the district court stated:

Our opinion may briefly be summarized: having held as a matter of law that the evidence was sufficient to support the verdict, we indicated that had the finding of facts been within our province we should have found for defendant rather than for plaintiff. *Id.* at 96 (addendum).

Nor is there anything writ in Heaven to say that our view of the facts—rather tha[n] the jury's is the correct one. *Id.* at 96.

In brief, although we adhere to the factual views expressed in our opinion, there can be no gainsaying that the jury could properly have come to the opposite conclusion. *Id.*

**26.** Even under Judge Moore's dissenting view in *Compton,* the district court's refusal to grant a new trial was proper. He there urged that "[o]nce the trial judge has made the determination that the weight of the evidence is 'overwhelmingly' against the verdict, he has the duty to exercise his discretion in view of the overall setting of the trial." *Compton v. Luckenbach Overseas Corp., supra,* 425 F.2d at 1134 (Moore, J., dissenting). Yet he distinguished situations where "the evidence is merely such that 'the trial judge would have reached a different verdict'" from those where "the verdict is 'overwhelmingly against the weight of the evidence.'" *Id.*

**27.** The trial judge espoused his opinion on the defense's inadequacy at some length. At a pretrial conference in November, 1976, it was revealed that no attorney had yet spoken to appellant. In addition, appellant's counsel asked local counsel in Texas to "represent" the doctor at his deposition. But the doctor did not even review the medical record before he testified. Moreover, the judge pointed out that

We have some difficulty understanding how the inadequacy of counsel's performance is relevant to whether a verdict should be set aside as against the weight of the evidence. Evidently the trial judge thought it was, relying on 11 C. Wright & A. Miller, *supra,* § 2806, at 45 (footnote omitted), which states:

> [T]he granting of a new trial on the ground that the verdict is against the weight of the evidence "involves an element of discretion which goes further than the mere sufficiency of the evidence. It embraces all the reasons which inhere in the integrity of the jury system itself."

Judge Knapp then held:

> The court being satisfied that under the facts as they actually exist (as opposed to those appearing in the record before us) the finding of liability is unwarranted, we would in ordinary circumstances have no hesitancy in setting it aside in the exercise of our discretion. However, in the instant situation defendant doctor is in no substantial way affected by the verdict. Its burden falls exclusively upon the carrier whose willful neglect brought it about. This raises the question wheth-

er an insurance carrier may deliberately neglect to prepare a case for trial and then, if the verdict is unfavorable, call upon the court to set it aside. We think not.

> *Bevevino v. Saydjari, supra,* No. 75 Civ. 2848, at 93 (footnote omitted).

◼ If this rather striking language and other similar comments made in the opinion stood alone, we might feel compelled to remand the case for an exercise of discretion without consideration of the carrier's neglect. Adjudication of appellant's insurer as guilty of failing to afford an adequate defense had no bearing on whether the jury verdict was against the weight of the evidence presented at trial, especially where the insurer was not even a party to the case.[28] Counsel's inadequate preparation is not, in our view, what the text writers had in mind in referring to the "integrity of the jury system."[29]

However, considering the whole opinion, and in particular the clarifying addendum, we do not believe that reconsideration of the motion is warranted.[30] Judge Knapp

---

no professional or paraprofessional hospital personnel testified to what had occurred in the emergency room. Furthermore, he noted that the experts for the defense were insufficiently prepared for cross-examination.

**28.** To consider the inadequacy of counsel's performance in determining whether a verdict should be set aside as against the weight of the evidence could have some unfortunate side effects. First, the trial judge would have to look outside the record and speculate on what facts would have been revealed by proper preparation, as may have been the case here in view of the explanation why "as a matter of actual fact," the verdict might not have been warranted. Second, it would seem that the entire trial process would be disrupted if the party whose case was presented poorly were rewarded while the party who obtained proficient counsel were penalized.

**29.** Rather, the commentators are addressing themselves to claims of derogation of the right to a jury trial by usurping the jury's principal function as finder of fact, and to concerns over abuse of the discretionary power to override a jury's determination when the evidence is sufficient to preclude both a directed verdict and judgment notwithstanding the verdict. And they conclude that cautious exercise of the

power safeguards the right to a jury trial by correcting the mistakes of jurors, thereby ensuring the integrity of our judicial system and promoting esteem for the jury system in the eyes of the public. *See, e.g., Tidewater Oil Co. v. Waller,* 302 F.2d 638, 642–43 (10th Cir. 1962) (quoted in the passage of Wright & Miller relied on by the court below, *ante* at 684); *Aetna Casualty & Surety Co. v. Yeatts,* 122 F.2d 350, 352–54 (4th Cir. 1941); *Felton v. Spiro,* 78 F. 576, 581–83 (6th Cir. 1897); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2806, at 49 (1973); C. Wright, *Law of Federal Courts* § 95, at 468 (3d ed. 1976).

**30.** This conclusion is bolstered by threshold doubts of our power to overrule a trial judge's discretionary decision not to grant a new trial on a claim that the verdict is against the weight of the evidence. *See Compton v. Luckenbach Overseas Corp., supra,* 425 F.2d at 1132–33 & n.2. In 1953, the court held that "[i]t is too well established to justify discussion" that "orders granting or denying motions to set aside verdicts on the ground that they are against the weight of the evidence" are not reviewable, even if erroneous. *Portman v. American Home Prods. Corp.,* 201 F.2d 847, 848 (2d Cir. 1953). Professors Wright and Miller suggest that while an order granting a motion to set aside

clearly expressed his reasons for refusing to grant a new trial, repeatedly stating in substance that the jury was perfectly justified in reaching its verdict.[31] Accordingly, his denial of the motion was properly based on his determination that the verdict was not against the weight of the evidence. We view the discussion of the carrier's "willful default" as mere surplusage,[32] and conclude that the denial of the motion for a new trial must stand.

## C. Evidence of Appellant's Bad Eyesight.

Dr. Saydjari urges that it was reversible error to permit evidence of his own eye disability at the time he treated appellee, see note 9 supra, to be used by the jury in

considering whether he was negligent. He asserts that Bevevino's theory of negligence was simply that the doctor failed to treat Bevevino's eye. Accordingly, the doctor argues, the state of his own eyesight was irrelevant.

■ Even accepting appellant's narrow view of Bevevino's negligence claims, however, the evidence was relevant under Rule 401 of the Federal Rules of Evidence; the jury could have inferred that the doctor's impaired vision precluded him from recognizing the gravity of the injury and thus from properly treating Bevevino's eye. Without belaboring the point, the doctor's poor eyesight was also relevant to two additional theories of negligence—failure to

the verdict should be reviewable, an order refusing to set aside the verdict should be reviewable, an order refusing to set aside a verdict as against the weight of the evidence might not be reviewable on appeal. 11 C. Wright & A. Miller, supra, § 2819, at 120–27.

**31.** See ante at 683, 685–686. In a footnote Judge Knapp stated:

The jury were therefore entitled to find that at the moment defendant doctor undertook responsibility for plaintiff's care the eye was salvageable and would have responded to appropriate treatment. Having made that basic finding of fact, the jury would have been fully justified in concluding that the treatment actually afforded was grossly—and even wantonly—insufficient. Thus, they could well have concluded that the defendant doctor's deposition claims not to remember anything about his first encounter with plaintiff were untrue, and would have been justified in finding that he was deliberately lying to conceal his own negligence. Moreover, as we have noted, (apparently because defendant doctor had correctly diagnosed the eye as unsaveable) nothing of any consequence was done by way of trying to save it. For example, there was considerable medical testimony to the effect that pressure placed on the injured eye by movements of the uninjured one might well have contributed to—if not actually caused—the ultimate loss of the former. The defendant doctor did not even take the elementary precaution of guarding against such pressure by putting a patch over the uninjured eye and thus immobilizing it. Bevevino v. Saydjari, supra, No. 75 Civ. 2848, at 96 n.8.

In the addendum to the opinion, Judge Knapp stressed that

the most [he] could have done [because the motion for judgment notwithstanding the verdict was "frivolous"] was to order another jury trial and that . . . there is no assurance a second jury would come to any different conclusion than did the first.

Id. at 96 (addendum); see note 25 supra.

He explained further that while counsel's failure to prepare Dr. Saydjari for his deposition hindered the defense,

it is entirely possible (and a second jury might well find) that such lack of preparation resulted in the emergence rather than the perversion of truth. Similarly, a second jury might well conclude (and perhaps correctly) that defendant doctor's false denial of the disability applications was intended to conceal the fact that he had actually suffered a seizure of blindness while treating [Bevevino].

Bevevino v. Saydjari, supra, No. 75 Civ. 2848, at 96.

Additionally, Judge Knapp certainly was correct in holding that notwithstanding his preference for appellant's expert ophthalmologists over plaintiff's, "the appraisal of expert testimony is . . . a matter within the jury's province. Manning v. New York Telephone Co. (2d Cir. 1968) 388 F.2d 910, 912 . . . ." Id. And he concluded by noting that "although [he] adhere[d] to the factual views expressed in [his] opinion, there can be no gainsaying that the jury could properly have come to the opposite conclusion." Id.

**32.** Perhaps the district court believed that its discussion would aid appellant in bringing a malpractice action against the insurer, or the insurer against counsel. The opinion twice mentions the possibility of such a recovery by appellant. Bevevino v. Saydjari, supra, No. 75 Civ. 2848, at 93–94 nn. 9 & 11.

read Dr. Nemerson's consultation report and act accordingly, and incompetent suturing of the laceration near appellee's right eye in the emergency room. Thus, the judge correctly charged the jury to consider whether the doctor's disability, if any, impaired his ability to act carefully under the facts and circumstances of the case.

Finally, we note that the documents in question flatly controverted appellant's deposition testimony on the existence and extent of his eye problems. They therefore adversely reflected on his credibility.

### D. *Excessive Verdict.*

Perhaps the most troubling aspect of the proceedings below is the size of the damage award. Were loss of Bevevino's eye and eyesight the only injuries in issue, we might well hold that, in view of his annual earnings and life expectancy,[33] the award was excessive. *See Mileski v. Long Island Rail Road Co.,* 499 F.2d 1169, 1173 (2d Cir. 1974) ($250,000 award for loss of eyesight with retention of eyeball not excessive, although an "all-time monetary high . . . and . . . considerably in excess of other [recent] awards . . . for substantially the same injuries" (footnote omitted)).

█ In our view, awards for irreparably damaged eyes, loss of eyesight in one eye, and loss of the eye itself are not conclusive in the instant case. The resulting psychiatric impairment, perhaps more serious than the eye injury, must also be considered. The undisputed testimony of Dr. Kalina, the psychiatrist whose testimony we have summarized above, sets this case apart from simple eye injury cases. The psychiatrist testified that appellee was permanently disabled, "that the loss of the eye was solely responsible for turning him from a buoyant and promising athlete into a suicide-prone

recluse who would forever be incapable of enjoying any human companionship," *Bevevino v. Saydajari, supra,* No. 75 Civ. 2848, 76 F.R.D. at 95, and that he was "fated to a life . . . of unrelieved misery." *Id.* The jury could have found that because of appellant's negligence, appellee was reduced to a shell of a human being. The jury may have been influenced not only by Dr. Kalina's prognosis that Bevevino would never adjust socially, but also by appellee's facial disfigurement, physical disabilities, past and future pain, and his general discomfort from everyday life. *See O'Gee v. Dobbs Houses, Inc.,* 570 F.2d 1084, at 1091 (2d Cir. 1978) (Feinberg, *J.,* concurring in part and dissenting in part); *cf. Schwartz v. United States,* 230 F.Supp. 536, 543 (E.D. Pa.1964) (awarding in excess of $600,000 of a $725,000 damage recovery solely for pain, suffering, disfigurement and inconvenience for medical malpractice resulting in removal of plaintiff's left eye and some bones and muscles from the left side of his face), *aff'd on other grounds,* 381 F.2d 627 (3d Cir. 1967). Under the circumstances, we agree with the trial judge that the verdict was not so grossly excessive "that it would be a miscarriage of justice to permit it to stand." *Dagnello v. Long Island Rail Road Co.,* 289 F.2d 797, 806 (2d Cir. 1961).

Judgment affirmed.

---

**33.** The parties agreed that the undiscounted loss of earnings for appellee's life expectancy of 34 years was $374,000. The jury was instructed to discount any damage award to its present value.