OPINION AND ORDER
 

 OWEN, District Judge.
 

 Plaintiff Craig Nadel, a designer, inventor, and marketer of toys sued defendant Will Isaksson, alleging that Isaksson breached an agreement they had to market and share royalties on a toy defendant Isaksson created and ultimately successfully marketed. Following a four day trial in December 1999, the jury found for plaintiff Nadel, and awarded him fifty percent of the over $500,000 in royalties earned on the toy. Isaksson moves for
 
 *379
 
 judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) or, in the alternative, a new trial under Fed.R.Civ.P. 59.
 

 Nadel and Isaksson first became acquainted in 1993, when Isaksson was working for a company called Buddy L at Brookside Models, and Nadel was partnered with one Dietmar Nagel in Design-O-Matic, a toy design business.
 

 In 1994, Isaksson created a toy called the “Dual Differential”. The Dual Differential is a remote-controlled two-wheeled vehicle with a tail, measuring approximately one foot across its axis. Its significant feature is its dual motor system, which permits the each of wheels to rotate at a different speed when the vehicle turns, allowing precise turning. Moreover, the Dual Differential can turn itself over, drive while upside down, and right itself. Isaks-son contacted Nagel and asked
 
 him
 
 to sell the Dual Differential to toy companies, as toy companies preferred to deal with inventors they already knew, and Nagel had these necessary connections, while Isaks-son, at that time, did not. Nagel and Design-O-Matic agreed to try to sell the Dual Differential. They also agreed to split proceeds equally, but there is a disagreement as to the other terms of this oral agreement. Nadel, apparently, took over primary responsibility of selling the Dual Differential, showed it to several toy companies, and continued trying to sell the Dual Differential for several years, to no avail.
 

 In early 1997, Nadel and Isaksson discussed making the Dual Differential more marketable.
 
 [1]
 
 Nagel agreed to have drawings made depicting possible designs for the toy’s exterior. Nadel also suggested that the Dual Differential should have “off-road tires”. Lastly, the motor system was simplified, by replacing it with the motor system from an existing toy, the Kenner Ricochet Car.
 
 [2]
 
 Isaksson and Nadel again agreed to share royalties in the same manner as for the Dual Differential.
 

 Nadel hired a firm called Joe Designer to make drawings of how the toy’s exterior should look, not-as Nadel later claimed— perform. In late February or early March of 1997, Joe Designer faxed such drawings to Isaksson. The drawings were of two types: some had a skull and cross-bones motif, pursuant to Isaksson’s suggestion, and others had a shark or fish-like appearance, pursuant to Nadel’s suggestion. Several of these drawings included small fin-like covers over the wheels. Isaksson, however, had serious objections to the renderings because, in effecting them, they inhibited the functioning of the toy. Isaks-son was concerned that the parts of the toy’s body that extended past the wheels would prevent the tail from flipping from forward to backwards, and that it would not be able to drive upside down or right itself.
 
 [3]
 

 Isaksson then constructed the new prototype, referred to as the “Modified Ken-ner Car,” without using the Joe Designer renderings. When it was completed, Na-del picked it up, along with the Dual Differential with the off-road tires. A day or two later, the Modified Kenner Car broke while Nadel was filming a videotape to show to toy companies, and he returned it together with another Kenner Ricochet Car for Isaksson to use in repairing it.
 

 Here, significantly, while he had the car for repair, Isaksson added to the center of the toy a sizable curved cam surface shaped like a fish’s fin which extended upward from the center of the body.
 
 See
 
 drawing,
 
 infra
 
 p. 380. This caused the toy to in fact jump quite high when a fast forward motion of the wheels was suddenly
 
 *380
 
 stopped by its being placed in reverse, which caused the toy-by reason of its fast forward momentum-to roll forward on the stopped wheels and ride onto the fin, which, by reason of its increasing distance from the axle, would throw the axle (and perforce the entire toy) into the air. This development was referred to by the parties, and is here called the “Jumping Toy”. The principle behind this is perhaps best conveyed by a drawing by the creator, Isaksson, in a exhibit in evidence, set forth below, which I couple with his description of the “pole vault” principle which makes it work:
 

 [[Image here]]
 

 MR. ISAKSSON: I have got a pencil with an eraser on it. So, ... when a real guy pole-vaults, there is a hole in the ground where he plants this into. But on a flat surface there is no hole. If I try to pole-vault here, I slide forward. There is a certain angle I get to which I don’t slide forward anymore. So the rubber that was on this outer surface here ... if I put that rubber on the end here, I get to some point where I say that’s a nice solid-that feels like it’s not going to slip. I can put that much of a pole vault into my toy. So what the toy is actually doing is it’s starting-I picked that angle and then-what this arc is actually doing, it’s as though the pencil stayed in exactly the same angle as though the pencil just gets longer, which is why it works so reliably.
 

 (Tr. at 329-30).
 

 Isaksson, very excited about his “new invention”, as he referred to it, told Nadel about it over the telephone. During this call, Nadel agreed to show the Jumping Toy to Hasbro. Some days later, Nadel called Isaksson to arrange pick up of the Jumping Toy to show it to Tiger Electronics the next day. Although Isaksson apparently did not want to show the Jumping Toy to Tiger because he wanted it to go to Hasbro first, he did not object at this time.
 

 However, Isaksson then spoke to a colleague, Mark Dowd, and told him about the Jumping Toy, and that Nadel was going to show the toy to Hasbro. Dowd then asked why Isaksson was involving Nadel when Isaksson could show the toy to Hasbro himself. The next morning, April 3, 1997, Isaksson called Nadel and told him that he (Isaksson) was going to show the toy to Hasbro himself, and then, if Hasbro didn’t want it, Nadel could show it to Tiger and other companies.
 

 Nadel was displeased with this turn of events, and much bickering ensued about this situation in the remainder of the telephone conversation. The parties continued the argument in a series of letters. In his first letter to Nadel, dated April 3, 1997, Isaksson maintained that he alone was responsible for inventing the Jumping Toy. Isaksson also admitted, however, that he “would feel guilty about cutting [Nadel]
 
 *381
 
 out entirely,” and offered Nadel one-third of the royalties earned on the Jumping Toy. Nadel responded in a letter dated April 4, 1997, stating that he and Isaksson were “50-50 partners” on the toy, and that he (Nadel) had helped make the toy more marketable. On April 14, 1997, Isaksson wrote Nadel to tell him that they “need[ed] to part ways.” Nonetheless, in a subsequent letter, Isaksson proposed that the parties enter into a contract, drafted by Isaksson, that would entitle Nadel to one-third of the royalties on the Jumping Toy and several other toys, provided Nadel agree to certain conditions. Nadel did not agree with all the conditions, and after the exchange of additional letters, the contract remained unsigned.
 

 On May 7, 1997, Isaksson showed the Jumping Toy to Hasbro, and Hasbro, immediately interested, entered into a license agreement with Isaksson for the Jumping Toy, and the toy was eventually marketed by Hasbro as SkyDriver, earning $584,-977.26 in royalties.
 

 Turning first to defendant’s motion under Rule 50, which provides that if a jury returns a verdict for which there is “no legally sufficient evidentiary basis for a reasonable jury to find for that party,” the court may direct the entry of judgment against that party as a matter of law. Fed.R.Civ.P. 50(a). In ruling on a Rule 50(b) motion, the court must
 

 consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The court cannot assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury.
 

 LeBlanc-Sternberg v. Fletcher,
 
 67 F.3d 412, 429 (2d Cir.1995) (quotation and citation omitted). The court may only grant the motion if there is a complete absence of evidence supporting the verdict, such that the jury’s verdict “could only have been the result of sheer surmise and conjecture, or ... such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against [the moving party].”
 
 Song v. Ives Labs., Inc.,
 
 957 F.2d 1041, 1046 (2d Cir.1992) (quotation and citation omitted).
 

 The jury found that the Jumping Toy was not a “new” toy in answer to verdict sheet interrogatory number one. However, defendant claims that the evidence at trial was insufficient in the area of contract to otherwise support the jury’s verdict. He contends: (1) there was no evidence of any agreement that plaintiff would share in the proceeds for a toy he did not market; (2) there was no evidence showing a contract existed with respect to the Jumping Toy; and (3) no evidence to overcome the application of the Statute of Frauds, N.Y. Gen. Oblig. L. § 5-701(a)(10) (McKinney 1989), rendering any unwritten contract void. Reviewing the record, 1 feel there was enough before the jury to support the jury’s finding that if the Jumping Toy was
 
 not
 
 a new toy, there was an agreement to share royalties. Accordingly, defendant’s motion for judgment notwithstanding the verdict as a matter of law is denied.
 

 However, in contrast to a motion for judgment as a matter of law, a district court on a motion for a new trial under Fed.R.Civ.P. 59 need not view the evidence in the light most favorable to the non-movant.
 
 See Song v. Ives Labs., Inc.,
 
 957 F.2d 1041, 1047 (2d Cir.1992). Indeed, the court may grant a new trial when the court concludes that “the jury has reached a seriously erroneous result or ... the verdict is a miscarriage of justice.”
 
 Song,
 
 957 F.2d at 1047 (citation and quotation omitted). In considering the motion,
 

 [t|he trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the
 
 *382
 
 legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge’s duty is essentially to see that there is no miscarriage of justice.
 

 Bevevino v. Saydjari,
 
 574 F.2d 676, 684 (2d Cir.1978);
 
 Sharkey v. Lasmo (Aul Ltd.),
 
 55 F.Supp.2d 279, 283 (S.D.N.Y.1999) (quoting
 
 Bevevino,
 
 574 F.2d at 684).
 

 Here, I conclude from a study of the record that the jury’s determination that the Jumping Toy was not a “new” toy is seriously erroneous and at a minimum against the clear weight of the evidence. The concept of “what is a ‘new1 toy?” was, at the trial, a very contentious issue, best demonstrated by the post-charge colloquy of the court and counsel:
 

 THE COURT: [Jury note] Court’s Exhibit 3, “Please provide us with the section of your Honor’s instructions that define new toy.” Now, I don’t know that I gave them a definition of “new toy.” This is obviously in response to question number 1, “Is the Jumping Toy a new toy?” I invite assistance.
 

 MR. PAVANE: What we discussed before, a toy developed from the modified Kenner car or Dual Differential.
 

 MR. SMURZYNSKI: What is the suggestion?
 

 THE COURT: I am throwing this out. Did it evolve from the modified Ken-ner car or did it embody a new concept of use and performance?
 

 MR. SMURZYNSKI: If it evolved, it’s not a new toy.
 

 THE COURT: If it embodied a new . concept of use and performance, then it is new.
 

 MR. PAVANE: My problem is I don’t think those two statements are mutually exclusive.
 

 THE COURT: I don’t agree with that statement.
 

 MR. SMURZYNSKI: I would accept that definition.
 

 THE COURT: Did it evolve from the modified Kenner or did it embody a new concept of use and performance?
 

 MR. PAVANE: I fail to see how you can take exception to what I said.
 
 It seems to me there is no question it jumped where the other car didn’t jump and that’s certainly a new performance.
 

 [4]
 

 THE COURT: New concept. The prior one didn’t have anything at all like the pole vault.
 
 [5]
 

 MR. PAVANE: I agree that could be a new feature and new performance. It doesn’t mean it didn’t evolve from the modified Kenner car.
 

 MR. SMURZYNSKI: I can’t accept that definition of evolved. That something could evolve into something new and still not be new.
 

 MR. DOUROS: Could you just cut out the first part, cut out the part about evolving?
 

 THE COURT: Embodied a new concept of use and performance.
 

 MR. PAVANE: Part of the problem is one of the fact issues for the jury is do they credit any of the testimony that it evolved also from seeing those drawings, PTX9? The question is,
 
 Does it embody a new feature or performance? How do you say no to that? Of course the answer is going to be
 
 yes.
 
 [6]
 
 That begs the question of what they are in there to find. To me, what it should be is that a new toy
 
 *383
 
 outside what the parties contemplated working on when they entered into the agreement.
 

 THE COURT: I don’t accept that. This may not work either, but how about: Did it reasonably evolve from the Dual Differential slash modified Kenner or did it embody a new feature with a new concept of use and performance? Or did it have a new concept of use and performance? Did it possess a new concept?
 

 MR. PAYANE: Ms. Collins points out that you did give an explanation of what you meant when you said that, and you said words to the effect, if it was not new, but just a development of the modified Kenner car, then you should find for the plaintiff. That’s what you said at the time. I think you should just repeat that.
 

 THE COURT: That doesn’t quite answer the question. It only gives you the dividing line. I can use the word, did it develop from the modified Ken-ner, or did it embody a new concept of use and performance?
 

 MR. PAVANE: On the issue of mutual exclusivity of the statements, I think if you said, Did it develop from the modified Kenner car, or alternatively, did it not reasonably develop from that, and rather, did it constitute a new concept, then I think it would be clear that you are talking about two separate principles.
 

 MR. SMURZYNSKI: That reasonably developed from the modified Kenner toy or did it embody a new concept instead? And the “instead” makes it clear that’s what a new toy is.
 

 THE COURT: Suppose it reads: Did it develop from the modified Kenner, or did it not reasonably develop from that, but in fact embody a new concept of use and performance?
 

 MR. SMURZYNSKI: That sounds like something we could live with.
 

 MR. PAVANE: Completely new concept?
 

 THE COURT: I just said new concept.
 

 MR. PAVANE: I am suggesting completely.
 

 MR. SMURZYNSKI: I don’t think that’s needed.
 

 MR. PAVANE: The only issue I have with that is, again, I don’t see how in that definition the jury factors in whether it developed from the modified Kenner car in conjunction, for example, with the drawings of PTX9.
 

 THE COURT: That’s part of the picture. That’s part of the process. I am going to write a note and send it back to them. In answer to your note, Exhibit 3, which we will send back to them, did the Jumping Car develop from the modified Kenner, or did it not reasonably develop from that, but in fact embody a new concept of use and performance?
 

 MR. PAVANE: Again, just for the record, I take exception to the last part of the phraseology. I think it should be, did it develop from that or did it not reasonably develop from that? I think that should be it.
 

 THE COURT: I going to add the former is not a new toy and the latter is. “In answer to your question, did the Jumping Car develop from the modified Kenner car, or did it not reasonably develop from that, but in fact embody a new concept of use and performance? The former is not a new toy and the latter is.”
 

 MR. PAVANE: My exception is noted for the record.
 

 THE COURT: Of course.
 

 (Tr. at 523-27) (emphasis added).
 

 The earlier Dual Differential, as to which there was a contract to split royalties, is a remote controlled vehicle with two wheels and a tail. Each wheel is controlled by a differential, which allows the wheels to turn at different rates. The Dual Differential also flips over, and is able to drive while upside down. When
 
 *384
 
 the vehicle is slowed down quickly by using the variable speed remote control, the tail flips from one side to the other and the vehicle “bounces” approximately an half and inch to an inch off the ground. It did not vault. It did not sell. The subsequent The Modified Kenner Car was created by replacing the foam wheels with inflated “off road” tires, and simplifying the drive mechanism by replacing the differentials with an independent motor system for each wheel. The length of the tail was increased as well in order to permit the car to drive in a straight line. This, however, prevented the Modified Kenner Car from even bouncing like the Dual Differential.
 

 Isaksson, however, went on to conceive of the effect the laws of physics would create by the interconnected addition of the result-achieving fin in a high speed, forward-momentum, sudden stop.
 
 [7]
 
 Thus, when wheels that were going forward at a high speed were suddenly stopped by putting the toy in reverse, the now-stopped tires would grip the ground, but the device, because of its momentum, would continue to roll forward onto the flaring cam which, because of its edge’s gradually-increasing distance from the axle, would lift the device off the ground and vault it into the air. The lift achieved is significant-in a videotape exhibit shown at trial, the Jumping Toy almost clears an overturned shopping cart.
 

 In conclusion, upon consideration of the evidence, I find as a matter of fact and law that the Jumping Toy is a “new” toy. I also find that in concluding that the Jumping Toy was not “new”, the jury reached a clearly erroneous result. The Jumping Toy was new in that it was capable, all by itself, of vaulting high into the air, which was not contemplated by its predecessors either in the general toy field
 
 [8]
 
 or in the Nadel/Isaksson relationship. Quite simply, the Dual Differential and the Modified Kenner Car did not vault, and were not expected or intended to vault. Therefore, those capabilities of the Jumping Toy constituted an entirely new concept of use and performance. In so finding, I leave other issues to a new trial, such as whether the parties did not did not have a contract governing the Jumping Toy, if so, what it was for, whether the Statute of Frauds is satisfied as to such a contract, and/or whether recovery in quantum meruit should be considered, as well as other issues. Accordingly, defendant’s motion for a new trial is granted to the extent delineated above. A conference with the Court is hereby set for Friday, April 7, 2000 at 2:30 p.m. in courtroom 1106, 40 Centre Street, to set a date for a new trial.
 

 So ordered.
 

 [1]
 

 . By this point, Nadel and Nagel had parted ways, as Nagel had fallen ill.
 

 [2]
 

 . Plaintiff claims he suggested this change, while defendant contends his colleague, Mark Dowd suggested it.
 

 [3]
 

 . Nadel’s efforts to use certain cosmetic drawings (those of Joe Designer) to claim credit for Isaksson’s concept of the fin and the application of the laws of physics as applied to its motion is not supported by the record.
 

 [4]
 

 . [By the Court] This seems to be a leaning by Nadel’s counsel at the time that the jury’s eventual conclusion as to the "newness” was erroneous.
 

 [5]
 

 . [By the Court] This involved for the first time principles of motion ánd energy deriving from the laws of physics not theretofore thought of with regard to this toy.
 
 See supra
 
 p. 380;
 
 infra
 
 pp. 383-84.
 

 [6]
 

 . [By the Court]
 
 See supra
 
 note 4.
 

 [7]
 

 . This description of what Isaksson conceived of has the ring of something which the Constitution describes as patentable. U.S. Const, art. I, § 8, cl. 8 ("Congress shall have Power ... To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.”) While Isaksson does have a patent application pending, nothing in this opinion relies on patent law or is intended to express an opinion on its patentability, only whether the concept behind the Jumping Toy is new.
 

 [8]
 

 . Earlier toys with modest jumps relied on small cams or springs which were unreliable.