707 F.2d 671
 Katherine H. SALOOMEY, Administratrix, Estate of Willard
Vernon Wahlund, Deceased, Plaintiff-Appellee,
v.
JEPPESEN & CO., Defendant-Appellant.
Peter C. HALSTEAD, Administrator, Estate of Erik F. Wahlund,
Deceased, Plaintiff-Appellee,
v.
JEPPESEN & CO., Defendant-Appellant.
 No. 712, Docket 82-6178.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 12, 1983.
Decided May 10, 1983.
 
 Ralph S. LaMontagne, Jr. and Floyd C. Dodson, Los Angeles, Cal. (Kern, Wooley & Maloney, Los Angeles, Cal., Marsh, Day & Calhoun, Raymond W. Beckwith, and Suzanne E. Baldasare, Bridgeport, Conn., of counsel), for defendant-appellant.
 James E. Kearns, Bridgeport, Conn., and Robert K. Marzik, Stratford, Conn., for plaintiffs-appellees.
 Before FEINBERG, Chief Judge, CARDAMONE and DAVIS,* Circuit Judges.
 DAVIS, Circuit Judge:
 
 
 1
 These are wrongful death actions, brought under diversity jurisdiction, in which defendant Jeppesen & Company (Jeppesen) appeals from jury verdicts and judgments rendered against it in the United States District Court for the District of Connecticut, including challenges to the trial court's denial of its motions for a new trial and for judgment notwithstanding the verdict. We affirm.
 
 
 2
 * On August 31, 1975, Captain Willard Vernon Wahlund, a Braniff International pilot with approximately seven thousand hours of flight experience, departed from an airport at Charleston, West Virginia, on a flight to Danbury, Connecticut. Wahlund was off-duty and was piloting his own Beechcraft Sierra; the plane was equipped with a King 214 receiver for instrument flight purposes and carried ample fuel. The flight was one leg of a trip which originated in Dallas and which was slated to end in Danbury. Wahlund's father and Erik, Wahlund's six-year-old son, accompanied him.
 
 
 3
 Wahlund carried navigational charts, produced by Jeppesen, on board the Beechcraft Sierra. Braniff purchased those charts from Jeppesen in Colorado for Wahlund's use (as well as comparable charts for Braniff's other pilots). Jeppesen furnishes its customers generally with three types of charts. Enroute charts display large geographic areas--several states or so in size--and flight paths or airways. Area charts portray geographic areas around major metropolitan areas and their correlative airways. Approach charts (or plates) depict runways as well as the vertical and horizontal coefficients of the approach paths to those runways.
 
 
 4
 While enroute from Charleston to Danbury, Wahlund decided--for a now unknown reason--to land at the Martinsburg, West Virginia airport.[1] Wahlund had the area chart for the Washington area, but he did not have an approach plate for the Martinsburg airport (as Braniff did not service that facility). The Martinsburg airport did not then possess a full instrument landing system; it was equipped with a localizer beam, but not a glidescope beam.[2] The Jeppesen chart for the Washington area, however, portrayed Martinsburg airport as containing a full instrument landing system; this was done through use of the designation "ILS" on the chart, adjacent to the designation of the Martinsburg airport.
 
 
 5
 There was substantial evidence from which the jury could also conclude the following: At 3:25 p.m. (EST) on the afternoon of August 31, Wahlund informed air traffic control that he wished to land at the Martinsburg airport and asked for vectors. Wahlund received them and was transferred to Dulles Arrival Radar. At 3:34, Dulles Arrival requested Wahlund to advise them as to what type of landing he desired. Wahlund replied, "[W]e'd like a uh ILS if ...." At this point, unknown to Wahlund, his transmission was cut off by another pilot's transmission. Nonetheless, Dulles Arrival responded, "Roger [i.e., "we have received your full message"] ... expect the uh localizer back course runway two six approach ...," and transferred control of Wahlund's plane to Dulles Departure Radar. Dulles Departure advised the pilot that visibility at Martinsburg was three miles, with light rain, fog and wind--adequate ILS conditions for a pilot of Wahlund's experience. At 3:36, Wahlund asked for a "front course ILS" instead of a "localizer back course" approach. Dulles Departure responded affirmatively and gave Wahlund appropriate vectors; shortly thereafter, Dulles Departure gave Wahlund the option of landing on "runway zero eight," which he accepted.
 
 
 6
 At 3:40 p.m., Dulles Departure told Wahlund that he was "cleared for the front course localizer" and not to "descend below two thousand nine hundred feet until crossing Gerrard inbound." Gerrard is a point in the sky--fixed by the intersection of the localizer beam and a cross beam--which served as the final approach fix for a localizer landing at Martinsburg. Gerrard appears on approach plates for Martinsburg, but not on the Washington area chart.
 
 
 7
 Wahlund's immediate response to Dulles Departure's altitude instructions is now unintelligible. Shortly thereafter, Wahlund reported that he was "established," or fixed, on the localizer. At 3:42, Dulles Departure advised, "[R]adar service terminated five miles from Gerrard you can contact Martinsburg radio ...." Four minutes later, Wahlund contacted Martinsburg and reported that he was located at Gerrard. Martinsburg gave Wahlund the weather and runway advisory. This was the last contact with the aircraft. Shortly thereafter the plane crashed, killing the three occupants.
 
 
 8
 The National Transportation Safety Board report on the crash noted that the plane wreckage was located at 1400' on the west side of a 1600' ridge near Gerrard. The plane apparently struck the ridge at a normal descent angle in virtually exact alignment with the runway and the localizer beam. All instruments on board were destroyed by a fire which apparently occurred on impact. No evidence of aircraft malfunction or pilot infirmity was discovered.
 
 
 9
 Following the tragedy, appellee Saloomey, as administratrix of Wahlund's estate, and appellee Halstead, as administrator of Erik's, filed separate actions in the district court. Saloomey's complaint named Jeppesen and the United States as defendants; Halstead's complaint named Jeppesen, the United States and Wahlund as defendants.[3] Both actions, insofar as they named Jeppesen as a defendant, were consolidated for jury trial. The counts against Jeppesen included negligence, breach of warranty, and strict products liability.
 
 
 10
 After a lengthy trial and two days of deliberation, the jury returned verdicts against Jeppesen on behalf of both plaintiffs. The jury also answered 18 separate interrogatories; those responses showed that the jury believed Jeppesen to be liable on all theories of liability urged by the plaintiffs--negligence, breach of implied and express warranties, and strict products liability. In a separate damages trial, the jury awarded Wahlund's estate $1,500,000 and Erik's estate $5,000. The court then denied Jeppesen's motions for a new trial and for judgment notwithstanding the verdict. This appeal followed.
 
 II
 
 11
 Jeppesen's first argument is that the district court erred in applying the substantive law of Colorado. See Halstead v. United States, 535 F.Supp. 782 (D.Conn.1982) (Halstead II ). Although we consider the question close, we cannot agree with appellant that the substantive law of West Virginia should govern.
 
 
 12
 Federal jurisdiction is based here on diversity of citizenship. See 28 U.S.C. Sec. 1332(a)(1) (1976). We must therefore employ the choice-of-law rule of the forum state, Connecticut, to ascertain the controlling substantive law. Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4, 96 S.Ct. 167, 168, 46 L.Ed.2d 3 (1975); Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Connecticut courts traditionally have held--in automobile tort cases--that the rule of lex loci delicti applies. See, e.g., Gibson v. Fullin, 172 Conn. 407, 411, 374 A.2d 1061, 1064 (1977); Menczer v. Menczer, 160 Conn. 563, 564, 280 A.2d 875, 876 (1971) (per curiam); Landers v. Landers, 153 Conn. 303, 304, 216 A.2d 183, 184 (1966); Chasse v. Albert, 147 Conn. 680, 683, 166 A.2d 148, 150 (1960). Jeppesen relies on that rule.
 
 
 13
 However, the Supreme Court of Connecticut has never had occasion to apply the rule of lex loci delicti to a wrongful death action arising from an aviation accident. We think that, in the absence of a direct ruling by the Connecticut courts on aviation accidents, the choice-of-law rule a Connecticut court would use in these circumstances is uncertain, and a federal diversity court has the duty to ascertain what rule the Connecticut court would establish. See West v. American Telephone & Telegraph Co., 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940); Bailey Employment System, Inc. v. Hahn, 655 F.2d 473, 477 (2d Cir.1981);[4] see also Meredith v. Winter Haven, 320 U.S. 228, 237, 64 S.Ct. 7, 12, 88 L.Ed. 9 (1943).
 
 
 14
 In our view, the district court should not be faulted in predicting, on the facts here, that a Connecticut court would choose to follow the "most significant relationship" test embodied in Restatement (Second) of Conflict of Laws Sec. 145 (1971). In Gibson v. Fullin, supra, the Connecticut Supreme Court indicated that its endorsement of the lex loci delicti rule was made in "motor vehicle cases." 172 Conn. at 411, 374 A.2d at 1064. The court recognized the judicial trend toward adoption of the "most significant relationship" test for selecting substantive law, but noted that Gibson presented "no compelling reason to abandon the traditional role." Id.
 
 
 15
 The current case presents very good reasons to replace the rule of lex loci delicti by the Restatement (Second) approach,[5] for aviation accidents.[6] In contrast to automotive travel, aviation accidents--especially those occurring in interstate air travel--more frequently pose situations in which the place of actual injury is wholly fortuitous and unimportant. See In re Air Crash Disaster Near Chicago, 644 F.2d 594, 615 (7th Cir.), cert. denied, 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 187 (1981); Kilberg v. Northeast Airlines, Inc., 9 N.Y.2d 34, 39, 211 N.Y.S.2d 133, 135, 172 N.E.2d 526, 527 (1961). That is true in this case. Appellees' decedents were domiciled in Connecticut, and appellant is a Colorado corporation engaged there in map-making; they would not normally expect the relationship between them to be governed by West Virginia law. The happenstance of an aviation accident in West Virginia as a result of appellant's map-making in Colorado should not alter the normal expectations of the parties. See Restatement (Second) of Conflict of Laws Sec. 145 comment e (1971); id. Sec. 6.
 
 
 16
 Other considerations support that conclusion. Connecticut, through its legislature and courts, has indicated strong interest in fully compensating its domiciliaries when they file meritorious wrongful death and strict products liability actions.[7] Those interests would not be served by the application of West Virginia law; a statute in force in West Virginia at the time of the accident limited wrongful death recoveries to an amount far below that permitted by Connecticut or Colorado. The then applicable West Virginia statute limited wrongful death recoveries to $10,000 for the death itself, $100,000 for monetary losses suffered by decedent's dependents, and expenses. See West Virginia Code Sec. 55-7-6 (1965), cited in Halstead II, supra, 535 F.Supp. at 785 n. 1. This limit has since been repealed.[8] In addition, West Virginia did not recognize actions in strict products liability at that time, although Connecticut and Colorado did. See Halstead II, supra, 535 F.Supp. at 786. But West Virginia has no interest in having its limitations enforced by a Connecticut court to protect a foreign corporation such as appellant, which does little or no business in West Virginia, against non-West Virginia plaintiffs seeking remuneration for their losses. Cf. DeFourneaux v. Sturm, Ruger & Co., 503 F.Supp. 2, 4 (D.Conn.), aff'd, 639 F.2d 768 (2d Cir.1980) (mem.), cert. denied, 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981).
 
 
 17
 Moreover, the Restatement (Second) "most significant relationship" approach is in accord, for interstate aviation cases, with the policy expressed by the Supreme Court of Connecticut in Gibson. There, the court emphasized that choice-of-law rules "should not only be simple and easy to determine and apply, but should also lead to predictable and desirable results." Gibson, supra, 172 Conn. at 412, 374 A.2d at 1064. Invocation of the lex loci delicti rule in aviation-generated wrongful death actions often produces unpredictable and undesirable results; the locale of injury may well have no connection to other relevant factors such as the parties' domiciles or residences, their places of incorporation, their principal places of business, or the location of the wrongful conduct.
 
 
 18
 The Restatement (Second) approach recognizes this inherent unpredictability and ameliorates it by including the place of injury in a choice-of-law analysis which also examines the relationship and other contacts between the parties. See Restatement (Second) of Conflict of Laws Sec. 145(2) (1971). The principles underlying this analysis harmonize with the concerns voiced by the court in Gibson; they include certainty and predictability of result as well as ease in determination and application of substantive law. Compare Gibson, supra, 172 Conn. at 412, 374 A.2d at 1064, with Restatement (Second) of Conflict of Laws Sec. 6(2) (1971). Moreover, the district judge's interpretation of Connecticut choice-of-law precedent is entitled to special deference because of his experience and familiarity with Connecticut law. See Bernhardt v. Polygraphic Co. of America, 350 U.S. 198, 204, 76 S.Ct. 273, 276, 100 L.Ed. 199 (1956).
 
 III
 
 19
 We likewise accept the district court's ruling, under the significant-factors test, that Colorado substantive law governs, rather than West Virginia's. See Halstead II, supra, 535 F.Supp. at 788-89. Colorado possesses the most significant relationship to the parties and the accident. Ticking off the contacts enunciated in Sec. 145 of the Restatement (Second), see supra note 4, we see that Jeppesen is a Colorado corporation; Colorado is also Jeppesen's principal place of business. In addition, Braniff purchased from Jeppesen in Colorado the navigational charts that were to be used by Wahlund and other pilots; appellant cannot contend that the application of Colorado substantive law to actions involving alleged defects in those charts was unforeseeable, unpredictable, or fortuitous.
 
 
 20
 As noted in Parts I and II, supra, West Virginia's only significant relation or contact with the parties and issues was the circumstance of the crash itself. This fact, standing alone, is insufficient to trigger the application of West Virginia substantive law to the measure of recovery and putative strict products liability.
 
 
 21
 Though both decedents were domiciled in Connecticut, that is not enough to justify the application of Connecticut law, given the strong impact of the Colorado contacts. We agree with the trial court, see Halstead II, supra, 535 F.Supp. at 789, that Connecticut's interest in amply compensating its residents who file wrongful death actions is adequately served in this instance by Colorado law.
 
 IV
 
 22
 Jeppesen also says that the trial court erroneously determined that the navigational charts are products, rather than services. If the charts should be characterized as the provision of services, then appellees' claims in strict products liability could not stand under Colorado law. See Halstead II, supra, 535 F.Supp. at 789.
 
 
 23
 Colorado recognizes actions in strict products liability as defined by Restatement (Second) of Torts Sec. 402A (1965). See Hiigel v. General Motors Corp., 190 Colo. 57, 63, 544 P.2d 983, 987 (1975) (en banc); Bradford v. Bendix-Westinghouse Automotive Air Brake Co., 33 Colo.App. 99, 106, 517 P.2d 406, 411 (1973). But the Colorado courts have never decided whether navigational charts are products for the purposes of Sec. 402A. The Ninth Circuit has assumed, without discussion, that appellant's portrayal of Federal Aviation Administration flight data on its charts is a "product" for strict liability purposes. See Aetna Casualty & Surety Co. v. Jeppesen & Co., 642 F.2d 339, 342-43 (9th Cir.1981).
 
 
 24
 We believe that the trial court did not err in classifying appellant's charts as products. The charts, as produced by Jeppesen and supplied to Wahlund by Braniff, reached Wahlund without any individual tailoring or substantial change in contents--they were simply mass-produced. The comments to Sec. 402A, supra, envision strict liability against sellers of such items in these circumstances. By publishing and selling the charts, Jeppesen undertook a special responsibility, as seller, to insure that consumers will not be injured by the use of the charts; Jeppesen is entitled--and encouraged--to treat the burden of accidental injury as a cost of production to be covered by liability insurance. See Restatement (Second) of Torts Sec. 402A comment c (1965). This special responsibility lies upon Jeppesen in its role as designer, seller and manufacturer. See Pust v. Union Supply Co., 38 Colo.App. 435, 439, 561 P.2d 355, 359 (1976), aff'd, 196 Colo. 162, 583 P.2d 276 (1978) (en banc); Restatement (Second) of Torts Sec. 402A comment f (1965).
 
 
 25
 Appellant's position that its navigational charts provide no more than a service ignores the mass-production aspect of the charts. Though a "product" may not include mere provision of architectural design plans or any similar form of data supplied under individually-tailored service arrangements, see Gibson v. Sonstrom, 2 Conn.L.Trib. No. 103, at 3 (Super.Ct. Hartford Cty.1976), the mass production and marketing of these charts requires Jeppesen to bear the costs of accidents that are proximately caused by defects in the charts. See Halstead II, supra, 535 F.Supp. at 791; K-Mart Corp. v. Midcon Realty Group, 489 F.Supp. 813, 816-19 & 818 n. 7 (D.Conn.1980); Restatement (Second) of Torts Sec. 402A comments c, f (1965).
 
 V
 
 26
 Jeppesen also levies an assault on the jury's findings of negligence and proximate causation--urging us to overturn the district court's refusal to grant appellant's motions for judgment notwithstanding the verdict and for a new trial.
 
 
 27
 We take up the former contention first. In reviewing that argument, we must scan the evidence in the light most favorable to appellees, and draw all reasonable inferences from the evidence on their behalf. See Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir.1970). In other words, the motion for judgment notwithstanding the verdict should have been granted only if there was but one conclusion reasonable people could have reached--in appellant's favor. Id.; see Billiar v. Minnestoa Mining & Manufacturing Co., 623 F.2d 240, 246 (2d Cir.1980); Bigelow v. Agway, Inc., 506 F.2d 551, 554 (2d Cir.1974). Neither the trial court nor we can assess the credibility of the witnesses or weigh the evidence if a rational jury could hold for appellees. Schulz v. Pennsylvania Railroad, 350 U.S. 523, 526, 76 S.Ct. 608, 610, 100 L.Ed. 668 (1956); Simblest v. Maynard, supra, 427 F.2d at 4. On that strict principle we cannot say that the district court erred in denying appellant judgment notwithstanding the verdict.
 
 
 28
 First, there was certainly adequate evidence to sustain the jury's specific findings that Jeppesen's area chart was defective in designating Martinsburg as having a full instrument landing system--through the designation ILS--and that Jeppesen was negligent in the manufacture or inspection of that chart. See supra Part I and infra note 10. Those facts are not seriously disputed. The jury also found that Willard Wahlund was negligent in the operation of the aircraft and the conduct of the flight.[9] The critical question, then, is whether there was sufficient evidence to support the jury's additional findings that Wahlund's negligence was not the proximate cause of the crash but that appellant's negligence and defective chart were. The trial judge noted, in his findings in appellees' actions against the United States, that Wahlund was negligent and that the air traffic controllers' negligence was not a proximate cause of the crash. See supra note 3. Nonetheless, the court held that the jury verdicts in this action against Jeppesen had to stand. That ruling was not improper merely because the judge would apparently have reached a different conclusion on appellant's causal responsibility for the crash. See Sentilles v. Inter-Carribean Corp., 361 U.S. 107, 110, 80 S.Ct. 173, 175, 4 L.Ed.2d 142 (1959).
 
 
 29
 We are constrained to agree with the court below in its evaluation of the jury's verdict. Initially, it was reasonable for the jury to conclude that Wahlund would not have attempted to land at Martinsburg but for the erroneous "ILS" designation on the Jeppesen-produced Washington area chart.[10] Wahlund told the air traffic controllers during two different radio exchanges that he desired a full, precision ILS approach, see supra Part I; the chart designation could well have led him to believe that one was available. When Wahlund first requested an ILS landing, his transmission was interrupted, yet the controllers responded "Roger," thereby apparently leading Wahlund to believe that his entire transmission was received and an ILS approach was feasible. Moments later, Wahlund received a second affirmative response when he requested a "front course ILS" approach instead of the proffered "localizer back course" landing. At no time did the controllers specifically inform him that the glidescope component for an ILS was unavailable at Martinsburg. The jury could conclude that Wahlund's actions were consistent with those of a pilot who believed that he was engaged in a proper ILS approach procedure.
 
 
 30
 The jury also possessed enough evidence to conclude that, once Wahlund was established on the localizer, he would not have known that glidescope instrumentation to go along with the localizer was unavailable. As we noted earlier (see supra note 1), Wahlund had previously informed air traffic control that his King 214 receiver was not performing properly, and some trial testimony indicated that the receiver had a history of occasional malfunctions. The jury could have determined that the warning flag on the receiver's glidescope needle was inoperative during the descent. Alternatively, the jury could have believed that Wahlund attributed the presence of the warning flag on the glidescope needle during the fatal approach to a weak signal; because Wahlund was fixed on the localizer, he could have assumed that the flag would disappear as he approached the source of the glidescope beam. Though there was conflicting evidence on these points, there was affirmative evidence from which the jury could have reached these conclusions.[11]
 
 
 31
 Contrary to appellant's position, we think, too, that the jury could have found that the aircraft was not in fact five miles from Gerrard intersection when Dulles Departure terminated radar service and contact with Wahlund. Three different witnesses for appellees testified that, in their opinion, Wahlund was further west of Gerrard at that time. The testimony of the controller, Gackowski, who gave Wahlund the location, indicated that radar reception in that area was not always accurate.[12] The jury could have inferred from this testimony that Wahlund's actual position, as reported by the controller, was incorrect (but that Wahlund did not know that fact). Nor was it unreasonable for the jury to find that Wahlund, incorrectly (but not negligently) believing he was five miles from Gerrard, could later report (incorrectly) to Martinsburg radio that he was passing Gerrard--having timed and monitored the assumed five-mile distance. Conversely, the jury could find, as it specifically did, that the pilot did not violate the Federal Air Regulations in continuing on the course he believed he had been given. As shown by the difference between the trial judge's findings (in the action against the United States) and the jury's findings (in the suit against Jeppesen), there could obviously be a parting of the ways on the ultimate issue of proximate causation,[13] but we cannot overturn the district judge's own conclusion that the difference was a rational one.
 
 
 32
 We hold, finally, that the district court did not abuse its discretion in declining to grant Jeppesen's motion for a new trial. See Bevevino v. Saydjari, 574 F.2d 676, 683-84 (2d Cir.1978); Diapulse Corp. v. Birtcher Corp., 362 F.2d 736, 744 (2d Cir.), cert. dismissed, 385 U.S. 801, 87 S.Ct. 9, 17 L.Ed.2d 48 (1966). In his denial of the new trial, the judge carefully considered the jury verdicts and his own position. Appellees were not compelled to demonstrate proximate causation with either absolute or mathematical certainty. Nor was the court required to order a new trial merely because of its disagreement with the fact finding of the jury, see Bevevino, supra, 574 F.2d at 685. Our review of the evidence leads us to conclude that the court below was not wrong in holding that the jury's verdict was not "seriously erroneous." See id. at 684-85.[14]
 
 
 33
 Affirmed.
 
 CARDAMONE, Circuit Judge, dissenting:
 
 34
 I agree with all parts of the majority opinion except section II. In section II my colleagues conclude that the district court properly held that the applicable Connecticut choice of law rule in this case was the "most significant relationship" test, rather than lex loci delicti. Because in my view Connecticut's long-standing choice of law rule for tort actions, lex loci delicti, should have been used, I respectfully dissent.
 
 
 35
 Less than two years ago this Court held that "Connecticut's choice of law is governed by traditional principles, and, in the case of tort actions, the rule of lex loci delicti still obtains." Bailey Employment System, Inc. v. Hahn, 655 F.2d 473, 476 (2d Cir.1981). No post-Bailey development in Connecticut law supports the majority's deviation from our holding in Bailey. Nor can the majority opinion point to any Connecticut state court decision in which the "most significant relationship" test was the appropriate choice of law rule in a tort case governed by Connecticut law.
 
 
 36
 Instead, the majority argues that the district court was free to predict that the "most significant relationship" test should apply because the Supreme Court of Connecticut has never had occasion to apply lex loci delicti to a tort action specifically arising from an aviation accident. While it is true that the Connecticut Supreme Court has not addressed the choice of law issue in a tort case resulting from an aviation mishap, as opposed to some other type of transportation accident, nothing in the language of the Connecticut decisions applying lex loci delicti in accident cases warrants the strained distinction now relied upon, see, e.g., Gibson v. Fullin, 172 Conn. 407, 374 A.2d 1061, 1064 (1977); Menczer v. Menczer, 160 Conn. 563, 280 A.2d 875, 876 (1971); Bissonnette v. Bissonnette, 145 Conn. 733, 142 A.2d 527, 528 (1958).
 
 
 37
 There is no real uncertainty as to what choice-of-law rule Connecticut's Supreme Court would apply in this case. Only six years ago in Gibson v. Fullin, the Connecticut Supreme Court unanimously refused to deviate from its traditional rule of lex loci delicti, see 374 A.2d at 1064, under circumstances at least as compelling as, if not more compelling than, those present here. In Gibson a Connecticut plaintiff brought a tort action against a Connecticut defendant for damages arising out of an automobile accident which had occurred in Florida. Connecticut's highest court held that the law of Florida, the situs of the accident, was controlling under the doctrine of lex loci delicti. Significantly, this decision was made despite the following facts: all of the relevant parties were residents of the forum state, Connecticut, whose tort law was not applied; the location of the accident was entirely fortuitous; application of Florida's guest statute totally barred the plaintiff's claim. By contrast, in the instant case not all of the relevant parties are domiciliaries of the forum state, and application of lex loci delicti would not totally bar plaintiffs' action. Instead it would simply limit the legal theories upon which plaintiffs could rely and the amount of recoverable damages. Given that the Connecticut Supreme Court expressly declined to abandon lex loci delicti in Gibson, it seems clear that they would not desert it here.
 
 
 38
 The majority's further argument--that Connecticut's inclination to fully compensate tort victims militates in favor of the "most substantial interest" test in this case--overlooks the fact that the purported inclination did not carry the day in Gibson. Additionally, while the majority opinion strongly asserts that an "interest" analysis lends itself to easy and predictable application, a policy consideration voiced in Gibson, see id. at 1064, lex loci delicti would typically be easier to apply than an "interest" analysis in an aircraft accident case.
 
 
 39
 It is true, of course, that many jurisdictions have shifted to one form or another of "interest" analysis. Nonetheless, Connecticut's Supreme Court has noted that trend and resolutely declined to follow it. Because the district court was obligated to follow Connecticut's clear choice of law rule in this diversity action, see Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), it was error to apply an "interest" analysis. Accordingly, I vote to reverse and remand this case to the district court.
 
 
 
 *
 Honorable Oscar H. Davis, of the United States Court of Appeals for the Federal Circuit, sitting by designation
 
 
 [1]
 About one hour earlier in the flight, Wahlund informed air traffic control that his King 214 receiver was performing in an erratic fashion
 
 
 [2]
 A localizer is a radio beam which activates a vertical needle on the plane's receiver to inform the pilot of lateral, or horizontal, course deviation from the prescribed instrument landing flight path. A glidescope is likewise a radio beam; it triggers a similar but horizontal needle on the receiver to advise the pilot of the proper vertical flight path (or altitude) for an instrument landing. Testimony adduced at trial revealed that if the transmitters for the localizer or glidescope beams--or the receiver--are malfunctioning, red flags may appear on the instruments. Red flags may also appear if the localizer or glidescope signals are weak or nonexistent
 
 
 [3]
 Both plaintiffs alleged that the negligence of air traffic controllers at Dulles Airport, Virginia, was responsible for the accident. In Halstead v. United States, 535 F.Supp. 780 (D.Conn.1981) (Halstead I ), the court held that West Virginia substantive law governed the plaintiffs' negligence claims against the United States under the Tort Claims Act. The court subsequently dismissed those claims after bench trial, finding that the actions of the controllers were not a proximate cause of the mishap. No appeal was taken
 
 
 [4]
 We note that our dissenting colleague relies heavily on this case as controlling. For reasons stated in the text, we think that the present case is distinguishable from Bailey, which involved a claim of fraud. In addition, the briefs and opinion in Bailey reveal that none of the parties suggested that Connecticut might not continue to adhere to its lex loci delicti rule
 
 
 [5]
 Restatement (Second) of Conflict of Laws Sec. 145 (1971) provides:
 (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in Sec. 6.
 (2) Contacts to be taken into account in applying the principles of Sec. 6 to determine the law applicable to an issue include:
 (a) the place where the injury occurred,
 (b) the place where the conduct causing the injury occurred,
 (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
 (d) the place where the relationship, if any, between the parties is centered.
 These contacts are to be evaluated according to their relative importance with respect to the particular issue.
 
 
 [6]
 The Supreme Court of Connecticut has already rejected the lex loci delicti rule in workers' compensation actions in favor of "interest analysis" and the Restatement (Second) "most significant relationship" approach. See Simaitis v. Flood, 182 Conn. 24, 29-33, 437 A.2d 828, 831-32 (1980); Restatement (Second) of Conflict of Laws Sec. 181 (1971)
 
 
 [7]
 See Conn.Gen.Stat. Sec. 52-555 (1977) (measure of wrongful death recovery equal to value of decedent's life and expenses); Marko v. Stop and Shop, Inc., 169 Conn. 550, 553, 364 A.2d 217, 219 (1975) (recognizing strict product liability actions); see also Halstead II, supra, 535 F.Supp. at 785-86
 
 
 [8]
 Colorado law limits liability in wrongful death actions to the actual pecuniary losses suffered by survivors, unless the survivors are not dependents of the decedents; in that case, recovery is limited to $45,000. See Colo.Rev.Stat. Sec. 13-21-203 (1973); Halstead, II, supra, 535 F.Supp. at 788-89
 
 
 [9]
 The interrogatories did not call upon the jury to specify the aspects of Wahlund's negligence, and the jury did not do so
 
 
 [10]
 Federal aviation regulations--both currently and at the time of the crash--designate "ILS" as the abbreviation for "instrument landing system" and "LOC" as the designation for "ILS localizer." See 14 C.F.R. Sec. 1.2 (1982); id. Sec. 1.2 (1975). Similarly, those regulations describe a full ILS system as comprising, inter alia, both a glidescope and localizer. 14 C.F.R. Sec. 91.116(k) (1982); id. Sec. 91.117(c) (1975). The edition of the Washington area chart which designated Martinsburg as an "ILS" rather than a "LOC" facility was apparently the only chart produced by Jeppesen that contained that type of error
 
 
 [11]
 By the same token the jury could reasonably believe that Wahlund has not consciously violated the instruction to stay at 2900>> (or above) until crossing Gerrard inbound. See also the next paragraph of the text
 
 
 [12]
 On direct examination, Gackowski stated that the radar target was often weak, and reception bad, in the area in which the Beechcraft Sierra was located just prior to the crash. Gackowski also noted, on cross-examination, that he occasionally lost small targets on the radar west of Gerrard and that Wahlund's plane disappeared from the screen as he terminated radar service
 
 
 [13]
 Including the question of the pilot's possible negligence in the last minutes of the flight
 
 
 [14]
 Because the jury's answers to the specific interrogatories make it plain that it based its verdict separately on negligence and strict liability--as well as on breach of warranties, in addition--and because we sustain the judgment on the grounds of negligence and strict liability, we need not consider whether the judgment can likewise be supported on breach of warranty