Alice **SVEGE**, Plaintiff,

v.

**MERCEDES BENZ CREDIT CORP.**, Defendant.

No. 3:01CV1771 (JBA).

United States District Court, D. Connecticut.

Jan. 31, 2002.

Hartford, CT, for Freightliner and Detroit Diesel Corp.

Everett E. Newton, Murtha Cullina LLP, Craig A. Fontaine, Richard A. Lord, Jr., Cramer, Alissi & Fontaine PC, Hartford, CT, for Jacobs Vehicle Sys.

### Ruling on Defendant's Motion to Dismiss [Doc. # 31]

ARTERTON, District Judge.

This lawsuit arises out of a tragic vehicle accident on the morning of September 16, 1999, in which three family members were killed and three were injured when a tractor-trailer owned by Mercedes Benz Credit Corporation ("MBCC") struck the concrete barrier separating east—and westbound traffic, became airborne, and landed on the vehicle driven by Thor Svege Sr., crushing its occupants. There are several resulting lawsuits currently pending in state and federal court in Connecticut and Pennsylvania by victims or their administrators. The instant suit is brought by Alice Svege in her capacity as administratrix of the estate of her son, Thor Sr., who was killed in the accident, and as guardian of her grandchildren, Thor Jr. and Briana, who were injured in the accident.

Jeffrey C. Pingpank, Cooney, Scully & Dowling, Hartford, CT, Leo Gilberg, Office of Attorney Leo Gilberg, New York City, for Alice G. Svege.

Frederick Joseph Trotta, LoRicco, Trotta & LoRicco, New Haven, CT, for Mercedes–Benz Credit Corp.

Daniel J. Krisch, Karen L. Dowd, Horton, Shields & Cormier, Hartford, CT, Peter M. Durney, Thomas A. Pursley, Cornell & Gollub, Boston, MA, for Daimlerchrysler AG.

Paul D. Williams, Jessica J. Mitchell, Christine A. Baily, Day, Berry & Howard,

The amended complaint lays out two operative theories of liability. First, as against MBCC, Svege asserts MBCC is liable under Connecticut's Automobile Rental Statute, Conn. Gen.Stat. § 14–154a ("C.G.S. § 14–154a"),[1] which holds the owner of a vehicle vicariously liable for damage caused by a renter's or lessee's operation of the vehicle. Second, Svege claims MBCC, Daimlerchrysler Corp., and Freightliner Corp. are liable under the Connecticut Product Liability Act, Conn. Gen.Stat. §§ 52–572m *et seq.*, for alleged

---

1. "Any person renting or leasing to another any motor vehicle owned by him shall be liable for any damage to any person or property caused by the operation of such motor vehicle while so rented or leased, to the same extent as the operator would have been liable if he had also been the owner."

defects in the tractor trailer claimed to have proximately caused the accident.

MBCC has moved to dismiss the lessor liability claims against it under Fed. R.Civ.P. 12(b)(6), claiming that Pennsylvania law, not Connecticut law, applies to this case, thus rendering C.G.S. § 14–154a inapplicable, and leaving plaintiff without a claim upon which relief could be granted. Svege's opposition to the motion claims that Connecticut law should apply. Svege does not dispute that Pennsylvania law does not recognize the type of liability upon which she grounds her claim for relief.

The disposition of this motion, therefore, depends wholly on the choice of law question. For the reasons set out below, the Court determines that Pennsylvania law applies, and therefore grants MBCC's motion.

## I. Facts [2]

Before their deaths, Aileen and Thor Svege Sr. were residents of Connecticut, and their minor children, Thor Jr. and Briana, were and are residents of Danbury, Connecticut. At the time of the accident, the Sveges were returning home from the Outer Banks in North Carolina, where their vacation was cut short by evacuation from the path of Hurricane Floyd. They had decided not to drive their planned route home through New Jersey because of heavy traffic, and instead took the Pennsylvania Turnpike. They stayed overnight at a hotel in Pennsylvania, and decided the next morning to take the children to the theme park in Hershey, Pennsylvania as a means of salvaging something of their aborted family vacation.

Scottie Wightman, a resident of Saltlick, Kentucky, was operating the tractor-trailer in the course of his employment with Hensley Industries, Inc. ("Hensley"), a Kentucky corporation with an office in Oklahoma. At the time of the accident, Wightman was returning a load of pipes to Fairless Hills, Pennsylvania, after having mistakenly taken the pipes to Dalton, Ohio, where the cargo was refused.

The tractor-trailer bore an Oklahoma license plate and a Kentucky Certificate of Title, both of which listed the owner as MBCC, a Delaware Corporation with its principal place of business in Lisle, Illinois. Wightman operated the tractor-trailer as an agent of his employer, Hensley. Hensley, in turn, had possession of the tractor-trailer by virtue of an open-end lease agreement dated January 16, 1998, which among other things provided that Hensley assumed liability and would defend and indemnify the vehicle's owner from any claim for liability, without limitation. The lease agreement was initially entered into between Kentucky Freightliner Trucks, as Lessor, and Hensley, as lessee, with MBCC becoming the lessor when the lease was assigned to MBCC by Freightliner. The lease agreement expressly provides that the lease "shall be deemed to have been made in the state named in Lessor's address above [Kentucky] and shall be interpreted, and the rights and liabilities of the parties determined, by the laws and courts of that state." Lease Agreement, attached as Exhibit A to the Amended Complaint, ¶ 23.

---

**2.** These facts, which are undisputed for the purposes of this motion, include those alleged in the complaint, in memoranda supporting and opposing this motion, and facts identified at the January 25, 2002, oral argument on this motion. Inasmuch as "matters outside the pleading [were] presented and not excluded by the court," the Court treats and disposes of this motion as one for summary judgment. Fed.R.Civ.P. 12(b). In light of the briefing by the parties and their further opportunity to present additional facts at oral argument, the Court is satisfied that "all parties [have been] given reasonable opportunity to present all material made pertinent to [this summary judgment motion]." *Id.*

Both vehicles carried insurance policies issued by Connecticut insurance companies.

## II. Applicable Conflict of Laws Analysis

As a federal court sitting in diversity in Connecticut, the Court must apply the choice of law rules that would be applied by the Connecticut Supreme Court. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In *O'Connor v. O'Connor*, 201 Conn. 632, 519 A.2d 13 (1986), the Connecticut Supreme Court abandoned "categorical allegiance" to the doctrine of lex loci delicti in tort actions, noting that the doctrine had "lost its theoretical underpinnings." *Id.* at 648, 519 A.2d 13. While the *O'Connor* court did not hold that it was abandoning the lex loci rule "in all of its manifestations," *id.*, it opined that "[c]hoice of law must not be rendered a matter of happenstance, in which the respective interests of the parties and the concerned jurisdictions receive only coincidental consideration." *Id.* at 646, 519 A.2d 13. Subsequently, in *Williams v. State Farm Mutual Automobile Ins. Co.*, 229 Conn. 359, 641 A.2d 783 (1994), the Connecticut Supreme Court used the principles of the *Restatement (Second) Conflict of Laws* to determine which state's law applied, reaching the same result utilizing the Restatement analysis as would have been the outcome under the lex loci doctrine.

*Williams* is instructive here. Williams, a resident of Connecticut, was involved in a motor vehicle accident in New York. His car was struck by a driver who was licensed in California and whose vehicle was registered and insured in New York. Williams received medical treatment at the scene of the accident, and was transported by ambulance to a New York hospital. The negligent driver's insurance policy provided for only $10,000 of coverage, so Williams sought an additional $15,000 of coverage from his own insurer under the uninsured motorists provision of his policy, which provided $25,000 of coverage. After New York law was applied in an arbitration proceeding to determine what damages Williams was "legally entitled to collect" under that contract provision, Williams filed suit against his insurer to vacate the arbitration award, which the trial court declined to do, holding that New York law was properly applied.

The Connecticut Supreme Court affirmed, agreeing that New York law applied, and using the Restatement approach to reach that result. Thus, counsel in this case do not dispute that the Connecticut Supreme Court would apply the Restatement's Most Significant Relationship analysis, rather than the lex loci delicti analysis of the past, to this analysis.

## III. Most Significant Relationship

Section 145 of the Restatement provides that "the General Principle" is as follows:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.[3]

---

**3.** These principles include the needs of the interstate and international systems; the relevant policies of the forum; the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; the protection of justi-fied expectations; the basic policies underlying the particular field of law; certainty, predictability and uniformity of result; and ease in the determination and application of the law to be applied.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

### A. The Place Where the Injury and the Conduct Causing the Injury Occurred

The Connecticut Supreme Court observed in *Williams* that "[w]hen the injury occurred in a single, clearly ascertainable state and when the conduct which caused the injury also occurred there, that state will usually be the state of the applicable law." 229 Conn. at 372, 641 A.2d 783, quoting from comment e to Restatement § 145. As it is undisputed that the injury and the conduct giving rise to the injury occurred in Pennsylvania, the Court begins with the proposition that Pennsylvania law will presumptively apply.

Svege argues that because the place of injury was merely fortuitous, it is not highly relevant to the choice of law analysis. In support of this fortuity argument, Svege cites *Halstead v. United States*, 535 F.Supp. 782 (D.Conn.1982), *aff'd sub nom Saloomey v. Jeppesen & Co.*, 707 F.2d 671 (2d Cir.1983), a case involving an airplane accident where the court declined to apply the law of West Virginia, the site of the plane crash because "[i]n the absence of any meaningful contact between the litigation and the state of West Virginia other than, by pure fortuity, the site of the crash, it would be offensive to traditional notions of justice and normal expectations to apply West Virginia law to adjudicate plaintiffs' wrongful death claims." *Id.* at 787. The court instead applied Colorado law, which lacked the "outmoded," severely low cap on wrongful death damages that West Virginia adhered to at the time of the accident. *Id.*

Further support for Svege's fortuity argument is *O'Connor*, in which the Connecticut Supreme Court described the location of the automobile accident occurring during a day trip to Quebec as "purely fortuitous," 201 Conn. at 636, 519 A.2d 13, and considered that as a factor when it applied Connecticut law by application of the Restatement, 201 Conn. at 656, 519 A.2d 13 ("The foregoing analysis leads us to conclude that Quebec's status as the place of injury is not a significant contact for purposes of our choice of law inquiry in this case. Accordingly, since Quebec has no other contacts with this litigation, we hold that Quebec has no interest in applying its no-fault act to bar the plaintiff's action.").

Finally, consideration of the fortuity of the accident site is reiterated in comment (e) of Restatement § 145. While the portion of the comment quoted by the *Williams* court notes that the state in which both the accident and the cause of the accident occurred will "usually" be the source of the applicable law, the comment goes on to provide:

> Situations do arise, however, where the place of injury will not play an important role in the selection of the state of the applicable law. This will be so, for example, when the place of injury can be said to be fortuitous or when for other reasons it bears little relation to the occurrence and the parties with respect to the particular issue.

Here, driver Wightman's intended destination was Fairless Hills, Pennsylvania, and the Sveges elected to be briefly pres-

ent in Pennsylvania. In trying to ferret out a common rationale for determining when an accident location is merely fortuitous, the Court discerns a difference between a plane en route elsewhere crashing into a mountain and a highway automobile accident. States are allowed to set their own speed limits and roadway regulations, even on mainly interstate thoroughfares such as the Pennsylvania Turnpike. The Connecticut Supreme Court recognized this interest in *O'Connor*, where it noted that "Quebec, as the place of injury, has an obvious interest in applying its standards of conduct to govern the liability, both civil and criminal, of persons who use its highways." 201 Conn. at 653, 519 A.2d 13 (citations omitted). States do not regulate airplane routes or flight patterns. Thus, *Halstead* provides little guidance, except by way of contrast.

While plaintiff is correct in pointing out that the *O'Connor* court characterized the Quebec accident site as purely fortuitous and applied Connecticut law, there were additional circumstances that weighed in favor of the application of Connecticut law. The case was brought by the passenger of the car against the driver for injuries she sustained in a one-car accident. "The parties, both of whom were Connecticut domiciliaries, were on a one day pleasure trip that began, and was intended to end, in Vermont." *Id.* at 634, 519 A.2d 13. Quebec law "provide[d] for government funded compensation for victims of bodily injury caused by automobile accidents," and completely barred any court action to recover damages. *Id.* at 635, 519 A.2d 13. The court further considered it relevant that "to the extent that [the parties] might have anticipated being involved in an automobile accident, they could reasonably have ex-

pected to be subject to the provisions of Connecticut's no-fault act." *Id.* at 657, 519 A.2d 13.

Webster's defines "fortuity" as "occurring by chance without evident causal need or relation, or without deliberate intention." While it is true that many events in life could be characterized as mere happenstance, describing the site of the highway crash in this case as a pure fortuity would eviscerate any consideration of the first two Restatement factors, contrary to *Williams'* recognition that the site of an accident will usually be the state of applicable law, 229 Conn. at 372, 641 A.2d 783.

This is a difficult case, and Svege's fortuity argument has definite appeal. Nonetheless, the Court concludes that while the site of this accident is undoubtedly random to some extent, the first two Restatement factors, which reflect Pennsylvania's interest in applying its highway safety standards, must be considered. These factors weigh in favor of Pennsylvania law, although their weight is tempered by the degree of randomness noted above.

### B. The Domicile and Residence of the Parties

Inasmuch as it is undisputed that the parties had no prior relationship, the only remaining factor to weigh is the respective domiciles of the parties, which excludes Pennsylvania.[4] There are two basic considerations on this point: the first concerns the purpose and nature of C.G.S. § 14–154a, while the second addresses the bare numerical division of the people involved in this accident.

---

**4.** Plaintiff urges the significance of both insurance policies having been issued by Connecticut-based insurance companies. Since the policies were issued in the respective states of vehicle registration and subject to those states' insurance regulations, the location of the companies' home office does not implicate Connecticut's interests.

1. Purpose and Nature of C.G.S. § 14–154a

According to Svege, the purpose of C.G.S. § 14–154a is compensation: "Section 14–154a has as its purpose the full and just compensation of victims, such as plaintiffs, by those who are in the best position financially to provide such compensation . . . ." Pl.'s Mem. Opp'n. at 9 (no citations). Claiming Connecticut's interest in applying its law for the benefit of its domiciliaries, Svege observes that in *O'Connor*, the Connecticut Supreme Court described the purpose of the Connecticut no-fault insurance law as one of compensation for victims of accidents. Next, the *O'Connor* court quoted approvingly from Chief Justice Traynor of the California Supreme Court:

> Limitations of damages . . have little or nothing to do with conduct. They are concerned not with how people should behave but with how survivors should be compensated. The state of the place of the wrong has little or no interest in such compensation when none of the parties reside there.

201 Conn. at 655, 519 A.2d 13, *quoting Reich v. Purcell,* 67 Cal.2d 551, 556, 63 Cal.Rptr. 31, 432 P.2d 727 (1967).

Svege further relies on *Tkaczevski v. Ryder Truck Rental,* 22 F.Supp.2d 169 (S.D.N.Y.1998), in which the court applied the choice of law doctrine enunciated in *Neumeier v. Kuehner,* 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972), holding that "[w]hen the law at issue concerns standards of conduct, such as rules of the road, a New York court will apply the law of the situs of the tort," but "[w]hen the rule prohibits, assigns, or limits liability after the tort occurs—so called loss-allocating rules—New York courts apply a three-part test adopted by the Court of Appeals in *Neumeier*." 22 F.Supp.2d at 172 (citations and quotations omitted). The court went on to apply New York law on the vicarious liability portion of the claim, which allowed for recovery by the New York plaintiff and was brought under a New York statute that is similar to C.G.S. § 14–154a, rather than Pennsylvania law, which did not.

Svege's argument that Connecticut law should apply because C.G.S. § 14–54a is loss-allocating and not conduct-regulating is persuasive. However, it suffers from a fatal flaw, because the Connecticut Supreme Court has repeatedly held that the purpose and function of 14–154a is to make the roadways safer. Thus, contrary to Svege's view, 14–154a is a conduct-regulating statute, not a loss-allocating statute.

In an exhaustive opinion tracing the origins of C.G.S. § 14–154a back to a statute enacted in 1797 as "An Act to Regulate Stage and Other Carriage Drivers," the Connecticut Supreme Court held in *Gionfriddo v. Avis Rent A Car Sys.,* 192 Conn. 280, 472 A.2d 306 (1984), that C.G.S. § 14–154a is the "legislative expression of public policy grounded in continued concern for safety of traffic upon the public highways." *Id.* at 288, 472 A.2d 306, *citing Levy v. Daniels' U–Drive Auto Renting Co.,* 108 Conn. 333, 336–37, 143 A. 163 (1928).

*Levy,* in turn, affirmatively disavows a loss-allocating rationale for the statute:

> The purpose of the statute was not primarily to give the injured person a right of recovery against the tortious operator of the car, but to protect the safety of the traffic along the highways by providing an incentive to him who rented motor vehicles to rent them to competent and careful operators, by making him liable for damage resulting from the tortious operation of the rented vehicles.

108 Conn. 333, 143 A. 163, 164.

This conduct-regulating purpose of Connecticut's Automobile Rental Statute thus implicates Connecticut's interest in safety on its roads. While Connecticut has not

expressly adopted the *Neumeier* doctrine, the result reached in *O'Connor* was predicated in large part on the fact that the Connecticut law at issue was one of victim compensation, and not conduct regulation. In fact, *O'Connor* noted that "[i]f the issue at stake ... were whether the defendant's conduct was negligent, we might well conclude that Quebec's interest in applying its law was of paramount significance." 201 Conn. at 653–654, 519 A.2d 13. Comment c ("Purpose of tort rule") to § 145 of the Restatement further supports this distinction:

> The purpose sought to be achieved by the relevant tort rules of the interested states, and the relation of these states to the occurrence and the parties, are important factors to be considered in determining the state of most significant relationship. This is because the interest of a state in having its tort rule applied in the determination of a particular issue will depend upon the purpose sought to be achieved by that rule and by the relation of the state to the occurrence and the parties. If the primary purpose of the tort rule involved is to deter or punish misconduct, as may be true of rules permitting the recovery of damages for alienation of affections and criminal conversation, the state where the conduct took place may be the state of dominant interest and thus that of most significant relationship. On the other hand, when the tort rule is designed primarily to compensate the victim for his injuries, the state where the injury occurred, which is often the state where the plaintiff resides, may have the greater interest in the matter. This factor must not be overemphasized, however. To some extent, at least, every tort rule is designed both to deter other wrongdoers and to compensate the injured person. Undoubtedly, the relative weight of these two objectives varies somewhat from rule to rule, and in the case of a given rule it will frequently be difficult to tell which of these objectives is the more important.

As the Restatement notes, "[t]o some extent, at least, every tort rule is designed both to deter other wrongdoers and to compensate the injured person." § 145, cmt. c. It is also undeniable that at least one *function* of C.G.S. § 14–154a is to provide a financially responsible party. However, the *Levy* court specifically disclaimed compensation as a rationale for C.G.S. § 14–154a: "[t]he purpose of the statute was not primarily to give the injured person a right of recovery against the tortious operator of the car, but to protect the safety of the traffic upon highways ...." 143 A. at 164. While *Levy* is almost 75 years old, and was decided at a time when the constitutionality of C.G.S. § 14–154a was still suspect, *Gionfriddo*, decided in 1984, still expressly reaffirms that the purpose of C.G.S. § 14–154a is to make the highways safer. 192 Conn. at 288, 472 A.2d 306.

*Tkaczevski*, the New York case discussed above, is distinguishable on this point. While the New York statute that Judge Sand described as loss-allocating in that case is virtually identical to C.G.S. § 14–154a in its text, the difference lies in its intended purpose. New York's highest court has repeatedly re-affirmed that in enacting its Automobile Rental Statute, "the Legislature intended that the injured party be afforded a financially responsible insured person against whom to recover for injuries." *Plath v. Justus*, 28 N.Y.2d 16, 20, 319 N.Y.S.2d 433, 268 N.E.2d 117 (1971) (citations omitted); *accord Morris v. Snappy Car Rental, Inc.*, 84 N.Y.2d 21, 27, 614 N.Y.S.2d 362, 637 N.E.2d 253 (1994) (statute "was designed to ensure access by injured persons to a financially responsible insured person against whom to recover for injuries") (citations and quo-

tations omitted); *Rauch v. Jones*, 4 N.Y.2d 592, 596, 176 N.Y.S.2d 628, 152 N.E.2d 63 (1958) (purpose of statute is creation of "a remedy for losses which an injured person had been subjected to in a class of cases where no right to relief existed"). Inasmuch as the Connecticut Supreme Court has not recognized C.G.S. § 14–154a as loss-allocating in nature, *Tkaczevski* is not on point.[5]

Thus, the third factor in the Restatement analysis does not heavily favor application of Connecticut law by virtue of the purpose and nature of C.G.S. § 14–154a.[6]

### 2. Numerical Division of Parties' Domiciles

It is true that a simple numerical count of the people injured or killed in this accident—i.e., those with the most concrete connection to the common nucleus of operative facts that forms the basis of this and other actions—reveals six Connecticut residents (the occupants of the Svege car), one Kentucky resident (Wightman), and no Pennsylvania residents. Inasmuch as no one contends that Kentucky law should apply, this numerical division tips the third Restatement factor slightly in favor of Connecticut law. *See Williams*, 229 Conn. at 372–373, 641 A.2d 783 (finding third factor "inconclusive" when one accident victim was domiciled in Connecticut but the other was domiciled either in New York or California—and ignoring the fact that both *parties* to the litigation were Connecticut residents); *O'Connor*, 201

Conn. at 655, 519 A.2d 13 (considering the fact that "neither the victim nor the tortfeasor is a Quebec resident" as relevant to the question of which law should be applied).

However, the domicile and residence of the parties, as with each Restatement factor, "must be evaluated according to [its] relative importance with respect to the particular issue." Restatement § 145; *accord O'Connor*, 201 Conn. at 652, 519 A.2d 13 ("it is the significance, and not the number, of § 145(2) contacts that determines the outcome of the choice of law inquiry under the Restatement approach"). No matter if "the particular issue" in this case is characterized as the negligence of Wightman in operating the truck or as the action of MBCC in leasing the truck, the Court discerns little importance of the bare numerical division of those injured in the accident as to the issue in this case.

As the Restatement notes, the domicile of the parties is highly relevant to certain legal issues. In particular, comments to § 145 of the Restatement list the following five examples of issues where the common domicile of the parties may control: interfamilial immunity, a guest passenger's right of action against a negligent driver, the question of survival of tort claims, charitable immunity, and the extent of an individual survivor's share of proceeds from a common tort recovery. As to each of these issues, the domicile and residence of the parties is of importance because

5. *Tkaczevski* is also distinguishable by virtue of the fact that the lessor's state of domicile, Florida, had a lessor liability statute. Thus, both parties to the litigation were domiciliaries of states that recognized such liability. Here, it is undisputed that Kentucky, Oklahoma and Illinois do not recognize strict lessor liability.

6. Given the modern commercial realities of long-term, open-ended commercial leases

such as the lease at issue here, the Court does have doubts about the continuing validity of the Connecticut Supreme Court's explanation of the underlying purpose that the legislature sought to achieve in enacting C.G.S. § 14–154a. Nevertheless, as a federal district court sitting in diversity, this Court is obliged to accept this rationale in the absence of some indication that the Connecticut Supreme Court would hold differently.

their home state has a special interest in the resolution of that particular issue.

In this case, however, the plaintiffs and the tortfeasor did not share a common domicile, and the issue is not one for which domicile is inherently important to its resolution. Thus, this third factor—the domicile and residence of the parties—presents no particular reason to depart from the Connecticut Supreme Court's observation in *Williams* that "[w]hen the injury occurred in a single, clearly ascertainable state and when the conduct which caused the injury also occurred there, that state will usually be the state of the applicable law." 229 Conn. at 372, 641 A.2d 783.

## IV. Conclusion

For the reasons stated above, the Court concludes that under the choice of law rules enunciated by the Connecticut Supreme Court, Pennsylvania has the most significant relationship to the occurrence and the parties, and the Court finds that Pennsylvania law applies to the action. As the parties have conceded that Pennsylvania law does not impose the type of liability asserted in the counts of the Amended Complaint that are subject to this motion, the defendant's motion to dismiss [Doc. # 31] the first, third and fifth counts of the complaint is GRANTED.[7]

IT IS SO ORDERED.

---

[7]. The Court is not unaware that this conclusion will bar recovery from MBCC on this theory of liability, and may have the potential to result in compensation that is less than adequate for the victims of this tragic accident, which took the lives of three people and left two young children orphaned. Neverthe-less, the Court's conclusion is that the Connecticut Supreme Court would determine that Pennsylvania law governs this action, and Pennsylvania has not seen fit to provide the strict liability that plaintiff requires in order to prevail on her claim.