**OHIO CASUALTY INSURANCE CO.,**

v.

**DENTEK, INC. et al.**

**No. 3:01 CV 1212(JBA).**

United States District Court,
D. Connecticut.

Sept. 2, 2003.

**656**

Jack G. Steigelfest, James F. Sullivan, Howard, Kohn, Sprague & Fitzgerald, Hartford, CT, for plaintiff.

John J. Coughlin, Milford, CT, Marc Edrich, Peter J. Ponziani, Avon, CT, Anthony B. Corleto, Corleto & Associates, Danbury, CT, Robert B. Keyes, Corsello & Cohen, Norwalk, CT, for defendants.

### Ruling on Cross Motions for Summary Judgment [Docs. ## 42 & 56]

ARTERTON, District Judge.

Plaintiff Ohio Casualty Insurance Company ("Ohio Casualty")[1] filed this declaratory judgment action against Dentek, Inc. ("Dentek"), Kamilla Siekierski, Middlesex Mutual Assurance Company ("Middlesex"), General Motors Acceptance Corporation ("GMAC") and Marie Gentile (both individually and as administrator of the estate of John Gentile). Ohio Casualty seeks a declaration that its policy ("the Ohio Casualty policy") provides no coverage for the April 15, 2000 automobile accident involving Siekierski and the Gentiles, and that Ohio Casualty consequently has no duty to defend in a currently-pending state court action brought by Gentile against Siekierski, Dentek and GMAC.

The parties have filed cross motions for summary judgment, each claiming that no genuine issue of material fact exists and that judgment should be rendered in its favor as a matter of law. For the reasons

---

**1.** Ohio Casualty is the successor in interest to the Great American Insurance Company, which issued the policy.

set out below, Ohio Casualty's motion is granted and defendants' motion is denied.

## I. Factual Background

Dentek leased a 1998 Oldsmobile Aurora from GMAC, primarily for the use (both personal and business) of Siekierski, Dentek's president. The lease required Dentek to buy and maintain $300,000 of insurance on the Oldsmobile, with GMAC as an additional insured. Siekierski was driving the Oldsmobile when involved in the April 15, 2000 automobile accident with the Gentiles.[2] Two separate insurance policies provide coverage that is potentially applicable to this accident: the Ohio Casualty policy and a separate insurance policy issued by Middlesex ("the Middlesex policy"). The Ohio Casualty policy, which Dentek purchased and maintained, contains a commercial automobile coverage component with $1 million liability coverage applicable to "any auto" for which Dentek may be liable,[3] in addition to general business coverage. The Middlesex policy provides $300,000 in automobile insurance coverage on the Oldsmobile.

The parties' dispute over who bought the Middlesex policy is made relevant by the existence of an automatic termination provision in the Ohio Casualty policy that is activated if the insured (Dentek) purchases replacement automobile insurance on one of its vehicles:

> With respect to automobile liability insurance policies only, your policy shall terminate on the effective date of any other insurance policy you purchase with

respect to any automobile designated in both policies.

("the automatic termination provision"). Ohio Casualty contends that Dentek purchased the Middlesex policy, and that by virtue of the automatic termination provision of the Ohio Casualty policy, the Ohio Casualty policy no longer covered the Oldsmobile once it became insured by Middlesex (as it was on April 15, 2000, the date of the Siekierski–Gentile accident). Defendants assert that Siekierski—and not Dentek—purchased the Middlesex policy, and thus the automatic termination provision was never activated and the Oldsmobile was covered on the date of the accident by both the Ohio Casualty policy and the Middlesex policy.

The Oldsmobile was leased by Dentek but insured under a separate policy from Dentek's Ohio Casualty policy because of Siekierski's poor driving record. After Dentek first took out the Ohio Casualty policy, Ohio Casualty determined that Siekierski's driving record was such that it would not accept any liability for her. Accordingly, Ohio Casualty issued an endorsement ("Voiding Coverage While A Named Person is Operating Car"), which specifically provided:

> It is agreed that the Company shall not be liable for loss, damage and/or liability due to the driving of an automobile covered by the policy by the following named person(s): Kamilla Siekierski

With this endorsement in effect, Siekierski would be an uninsured driver while operating the Oldsmobile, absent other insur-

---

**2.** The accident occurred on a drive that was not business related.

**3.** The Ohio Casualty policy uses numerical designations to indicate which automobiles correlate to which specific coverages. For example, the "physical damage / comprehensive" coverage provided by the policy has the designation "7, 8," meaning that only autos specifically listed in Item Three (designation 7) or hired autos (designation 8) are protected by this coverage. The "liability" coverage at issue here, however, has the designation "1," which means that "any auto" is protected by this coverage. Designation 1 is the broadest designation possible, having no limiting language.

ance. Thus, Dentek's insurance broker, Robert Oman of the Stone Agency, obtained the Middlesex policy, naming Siekierski (not Dentek) as the insured.

As the named insured on the Middlesex policy, Siekierski had certain incidents of ownership, such as the right to cancel the policy. Additionally, the address on the policy was Siekierski's home address and the bills were mailed to Siekierski's home. While Siekierski's deposition testimony is at times muddled,[4] she testified in substance (and the parties agreed at oral argument) that she received the use of an insured Oldsmobile as a fringe benefit from Dentek for both personal and business use. Nothing in the record shows any accounting that funds were specifically withheld from her salary to pay for the automobile insurance; instead, Siekierski implied that had the car not been provided, she would have expected a greater salary. The defendants agreed at oral argument, consistent with the record, that Siekierski never wrote a check to Dentek in payment of the premium, and that there was never a deduction from Siekierski's salary that equaled the Middlesex policy premium.

Subsequently, Ohio Casualty revoked its named driver exclusion after Siekierski had driven for a certain period without any additional infractions or accidents. An endorsement effective July 19, 1999 provides:

DELETED FORM CA8020 DRIVER EXCLUSIONS ON KAMILLA SIEKIERSKI

ADDED DRIVER NAME LIST KAMILLA SIEKIERSKI

Despite the fact that the reason for purchasing the Middlesex policy was eliminated on July 19, 1999 when the exclusion of Siekierski from Dentek's business policy was rescinded, the Middlesex policy was maintained and the Oldsmobile was never added as a scheduled auto in Item 3 in the Ohio Casualty policy.

After the accident on April 15, 2000, Ohio Casualty and Middlesex were notified of the Gentile claim. Marie Gentile filed suit in the Connecticut Superior Court against Siekierski (as the driver), Dentek (as the lessee/employer) and GMAC (as the lessor).[5]

## II. Analysis

### A. Legal Standards Applicable to the Motions

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). On cross-motions for summary judgment, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993) (*citing Schwabenbauer v. Board of Educ. of Olean,* 667 F.2d 305, 313 (2d Cir.1981)). "Rather, the court must evaluate each party's motion on its own

---

**4.** *See* Siekierski Dep. at 43, 47, 65–67 for various, often inconsistent, descriptions of the arrangement between Dentek and Siekierski with regard to the Oldsmobile.

**5.** GMAC's potential liability stems from Conn. Gen.Stat. § 14–154a, which provides: "Any person renting or leasing to another any motor vehicle owned by him shall be liable for

any damage to any person or property caused by the operation of such motor vehicle while so rented or leased, to the same extent as the operator would have been liable if he had also been the owner." *See also Svege v. Mercedes Benz Credit Corp.,* 182 F.Supp.2d 226, 232–234 (D.Conn.2002) (discussing history and purpose of statute).

merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer*, 667 F.2d at 314.

This law regarding construction of insurance contracts is well-settled in Connecticut:

> An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract and enforced in accordance with the real intent of the parties as expressed in the language employed in the policy. The policy words must be accorded their natural and ordinary meaning. Under well established rules of construction, any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy. This rule of construction may not be applied, however, unless the policy terms are indeed ambiguous. Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. Construction of a contract of insurance presents a question of law for the court.

*Hansen v. Ohio Cas. Ins. Co.*, 239 Conn. 537, 542–543, 687 A.2d 1262 (1996) (internal quotations, citations and alterations omitted).

### B. Automatic Termination Provisions Under Connecticut Law

Termination of one insurance policy by substitution of a different policy is a well-settled insurance concept. The leading insurance law treatise notes that there are two situations in which cancellation by substitution generally takes place:

> In the first, specific policy or statutory provisions allow an insured to exchange his or her existing insurance policy for another form of policy, often written by a different insurer. Unlike renewal, an insured's exchange of his or her original policy for another form of policy creates a new contract.
>
> In the second situation, the insured has existing insurance covering a specific risk, usually related to property, and purchases additional insurance on the same property while (a) intending the new insurance to replace the existing insurance, or (b) the terms of the existing insurance specify that the purchase of additional insurance shall have the effect of cancellation.

2 Couch on Insurance § 31:126 (3d ed. & Dec. 2002 supp.). This case concerns the second situation: the terms of the existing policy specify that the insured's purchase of additional insurance on the same property will have the effect of cancelling the existing policy.

The Connecticut Supreme Court addressed automatic termination provisions in *Majernicek v. Hartford Cas. Ins. Co.*, 240 Conn. 86, 688 A.2d 1330 (1997), in which the insureds claimed that the automatic termination clause in their policy [6]

---

6. The clause at issue in *Majernicek* read: "If you obtain other insurance on your covered auto, any similar insurance provided by this policy will terminate as to that auto on the effective date of the other insurance." 240 Conn. at 88 n. 1, 688 A.2d 1330. The difference between the *Majernicek* clause and the automatic termination clause in the Ohio Casualty policy is that the *Majernicek* clause only terminated *"similar* insurance provided by this policy" (emphasis added), while the clause at issue here has no similarity requirement. *Cf. South Carolina Farm Bureau Mut. Ins. Co. v. Courtney*, 342 S.C. 271, 536 S.E.2d 689 (Ct.App.2000) (where termination clause provided: "[i]f you obtain other insurance on your covered auto, any similar insurance provided by this policy will terminate as to that auto on the effective date of the other insurance," a replacement automobile policy that

was invalid because it violated a Connecticut statute requiring written notice of cancellation,[7] claiming that the first insurer was obligated to send written notice of cancellation to them despite the triggering of the automatic termination clause by virtue of their purchase of additional insurance from the second insurer. The Connecticut Supreme Court rejected this argument, relying principally on the purpose of the notice statute and the intent of its drafters:

> [I]n enacting § 38a–343(a), the legislature appears to have intended to eliminate the potentially harsh consequences to an insured of driving without knowing that his or her policy was inoperative. *See* 13 H.R. Proc., Pt. 10, 1969 Sess., p. 4437, remarks of Representative Gerald Stevens ("[i]f ... someone has his insurance policy canceled and is driving under the mistaken impression that he has insurance and subsequently is involved in an accident, the consequences can be rather severe"); *see also Johnston v. American Employers Ins. Co.*, 25 Conn.App. 95, 97–98, 592 A.2d 975 (1991) ("purpose of General Statutes § 38a–343 ... is to assure that before an automobile insurance policy is cancelled the insured has a clear and unambiguous notice of the cancellation").

Thus, the requirement that an insurer provide an insured with notice of its decision to cancel an automobile insurance policy was a legislative effort that focused on affording an insured an adequate opportunity to procure other insurance.

In the present case, the plaintiffs' purchase of the Allstate policy was an affirmative act by the plaintiffs unilaterally terminating the defendant's policy, rather than a basis for a decision by the defendant whether to cancel the policy. Written notice of cancellation obviously was not necessary in order for the plaintiffs to have had an adequate opportunity to procure other insurance. Indeed, the plaintiffs' purchase of similar insurance from Allstate was the means by which the plaintiffs triggered the policy's automatic termination clause. Consequently, requiring the defendant to provide a written cancellation notice to the plaintiffs after the plaintiffs had triggered the automatic termination clause by procuring other similar insurance would not have furthered the legislative purpose of § 38a–343(a). We can discern no public policy reason for extending the reach of § 38a–343(a) to allow an

---

did not include underinsured motorists coverage was not "similar" insurance), *aff'd*, 349 S.C. 366, 563 S.E.2d 648 (2002). Defendants' arguments regarding dissimilarity of the Ohio Casualty and Middlesex coverages are thus unavailing.

7. The specific statute at issue was Conn. Gen. Stat. § 38a–343(a). To understand that statute's application, however, it is necessary to understand the entire statutory context, which was summarized by the court:

> General Statutes §§ 38a–341 through 38a–344 govern the procedures for the cancellation of an automobile insurance policy by an insurer. Under § 38a–342, an insurer can choose to cancel a policy due to the insured's failure to pay the premium, or

because of the revocation of the insured's driver's license or motor vehicle registration or that belonging to any operator living with the insured. Section 38a–343(a) provides that "[n]o notice of cancellation of policy to which section 38a–342 applies may be effective unless sent, by registered or certified mail or by mail evidenced by a certificate of mailing, or delivered by the insurer to the named insured at least forty-five days before the effective date of cancellation, provided where cancellation is for nonpayment of premium at least ten days' notice of cancellation accompanied by the reason therefor shall be given ..."

*Majernicek*, 240 Conn. at 92–93, 688 A.2d 1330.

insured to terminate a policy by his or her own action, and yet retain coverage under the insurer's policy solely because the insurer did not send written notice of cancellation. Accordingly, we conclude that, when an insured triggers an automatic termination clause by obtaining other insurance, the insurer is not obligated by § 38a–343(a) to send the insured notice of cancellation.

240 Conn. at 93–94, 688 A.2d 1330.

*Majernicek* was applied in *American Express Ins. Co. v. AIG Ins.*, No. CV 970402720S, 1998 WL 470637 (Conn.Super. July 30, 1998), where the court determined that a *third party's* unilateral act of obtaining insurance on an insured's vehicle cannot trigger the automatic termination provision of the insured's automobile insurance policy unless the third party is acting as the insured's agent. The court reasoned that *Majernicek* applied only to those situations in which the insured procures substitute insurance.[8]

### C. Discussion

#### 1. Purchaser of Middlesex Policy

■ Defendants' argument that Siekierski, not Dentek, purchased the Middlesex policy is unavailing. The Oxford English Dictionary's definition of the chief use of the word "purchase" accords with the common, accepted usage of the term: to purchase is "[t]o acquire by the payment of money or its equivalent; to buy."[9] "Buy," in turn, is defined as (and commonly understood to mean) "[t]o get possession of by giving an equivalent, usually in money; to obtain by paying a price; to purchase."[10] Although the policy here is issued in Siekierski's name and gives her certain rights, there can be no dispute that Dentek paid for the policy and was the beneficial owner of the policy, which insured its leased car. The policy was part of Dentek's general undertaking to provide Siekierski with an automobile as a fringe benefit, and satisfied Dentek's lease obligation to provide insurance on the car. Thus, Dentek "acquire[d the Middlesex policy] by the payment of money or its equivalent" and "[took] possession of [the policy] by giving an equivalent," and accordingly "purchased" the Middlesex policy.

At oral argument, defendants suggested that the difficulty in discerning who "purchased" the policy evidences ambiguity in the term "purchase," and such ambiguity must be construed against the drafter. While it is true that the term "purchase" is not defined in the Ohio Casualty policy, there is no legal "ambiguity" in the term "purchase," which is a commonly used and nearly universally understood non-technical term.[11] The ambiguity argued is thus

**8.** The issue of third party procurement was more starkly presented in *American Express* than it is here, as the automatic termination provision in that case was in the passive voice: "If other insurance is obtained on your insured car, any similar insurance afforded under this policy for that car will cease on the effective date of the other insurance." 1998 WL 470637 at *2. That clause does not specifically specify who will have obtained the insurance (only that it is obtained), whereas the clause in the Ohio Casualty policy is in the active voice: "your policy shall terminate on the effective date of any other insurance policy *you purchase* with respect to any automobile designated in both policies" (emphasis added).

**9.** Oxford English Dictionary (2nd edition, online version) (1989), definition of "purchase" (verb, entry 6(a)), available at <http://dictionary.oed.com/cgi/entry/00192803>.

**10.** Oxford English Dictionary (2nd edition, online version) (1989), definition of "buy" (verb, entry 1(a)), available at <http://dictionary.oed.com/cgi/entry/00030311>.

**11.** *See, e.g., Streitweiser v. Middlesex Mut. Assurance Co.*, 219 Conn. 371, 375–376, 593

not in the term itself, but rather which entity fits the definition of a purchaser.

### 2. Applicability of Automatic Termination Provision

Defendants also argue that the automatic termination provision is not applicable to the Ohio Casualty policy's liability coverage for the Oldsmobile because the Oldsmobile was not "designated" in the Ohio Casualty policy for liability coverage. They note that the automatic termination provision only terminates coverage "with respect to any vehicle designated in both policies," and reason that the Oldsmobile was not "designated" because designation "1" (signifying "any auto") was the designation that correlated with the liability coverage, rather than another designation (such as designation "7," signifying those autos specifically described in Item 3).

Defendants' argument fails for two reasons. First, it is factually inaccurate since under the express terms of the policy "any auto" for which Dentek may be liable is a designated auto for liability coverage purposes. Second, if the Oldsmobile is not "designated" for liability coverage under the policy, as defendants argue, then there is no Ohio Casualty coverage in effect for the Oldsmobile. In short, the fallacy of defendants' argument lies in equating "designation" with being specifically described in Item 3 of the policy, without any textual or logical reason for doing so.

### 3. Other Challenges to the Automatic Termination Provision

Defendants make several arguments that can be loosely grouped together as public policy or ambiguity concerns. According to defendants, excepting the Oldsmobile from liability coverage under the Ohio Casualty policy would: (1) render superfluous and illusory the "any auto" designation, because there would be at least one auto not covered; (2) render superfluous and illusory the endorsement restoring coverage for Siekierski under the Ohio Casualty policy; (3) result in ambiguity that must be construed against the drafter and in favor of coverage; and (4) contravene the legislature's intent that notice be given before an insurance policy is cancelled.

▆ The automatic termination provision is one part of the larger Ohio Casualty policy, which must be (and is capable of being) read together as a whole.[12] The "any auto" designation is not made "illusory" by the fact that some autos are *potentially* outside the ambit of coverage for several reasons. First, the possibility of non-coverage of vehicles is plainly set out in the automatic termination provision, which is not complicated or difficult to understand.[13] Second, such possibility of

---

A.2d 498 (1991) ("natural and ordinary" meaning of the word "hits" was accepted as the meaning intended by the parties, and the word was not ambiguous); *see also Downs v. National Cas. Co.*, 146 Conn. 490, 494–495, 152 A.2d 316 (1959) ("A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings.") (citation omitted).

**12.** *See Streitweiser*, 219 Conn. at 376, 593 A.2d 498 ("If it is reasonably possible to do so, every provision of an insurance policy must be given operative effect.") (*citing A. M. Larson Co. v. Lawlor Ins. Agency, Inc.*, 153 Conn. 618, 621–22, 220 A.2d 32 (1966)).

**13.** *Compare, e.g., Israel v. State Farm Mut. Auto. Ins. Co.*, 259 Conn. 503, 789 A.2d 974 (2002) (language of policy was conflicting and not "comprehensible to a lay insured" where one provision stated that an insured's failure to maintain underlying coverage would result in the insured being responsible for any loss up to the amount of the required underlying coverage, while another provision in another section provided for complete forfeiture of

non-coverage is easy for an insured to avoid: all the insured must do is refrain from purchasing additional insurance on the vehicle.[14] Finally, a specific exclusion is a recognized and accepted technique for delineating risks.

Giving effect to the automatic termination provision also does not render superfluous the deletion of the named driver exclusion, which had applied to any vehicle driven by Siekierski. While both (1) the named driver exclusion was in effect and (2) the automatic termination provision was operating to exclude coverage on the Oldsmobile, Siekierski was not covered if she were driving *any* Dentek automobile. Once the named driver exclusion was removed, Siekierski was covered when driving any Dentek automobile *other than* the Oldsmobile, for which Ohio Casualty coverage was not in effect for any driver by operation of the automatic termination provision. Thus, the endorsement deleting the named driver exclusion was in effect for other Dentek vehicles and was not illusory.

Defendants' claim that there is ambiguity in the placement of the automatic termination provision (under the heading "cancellation and non-renewal," without use of the words "termination" in conspicuous bold type), lacks merit. While the Ohio Casualty policy is a lengthy document, it fairly and accurately sets out this important term in a way that is understandable: the provision plainly states that it will "terminate on the effective date of any other insurance policy you purchase with

respect to any automobile designated in both policies."

■ Defendants' assertion that the automatic termination provision is inconsistent with the "other insurance" provisions of the policy, which coordinate benefits with respect to property that is insured under both the Ohio Casualty policy and another policy, is similarly unavailing. The automatic termination provision applies to only a small subset (the automobile liability insurance portions) of the coverage provided by the Ohio Casualty policy, and the provision by its terms "terminates" the Ohio Casualty coverage, thus meaning that there is never a time in which an automobile would be subject to both policies and the other insurance provisions would be implicated.

■ Finally, Dentek is not, as defendants claim, left without insurance as a result of the automatic termination clause as it has the Middlesex policy which it purchased, albeit at lower liability coverage levels.[15] As the Connecticut Supreme Court discussed in *Majernicek*, the purpose of the statute requiring notice of cancellation was to ensure that an insured had adequate notice and an opportunity to procure substitute insurance. 240 Conn. at 93, 688 A.2d 1330. When cancellation results from the operation of an express and unambiguous automatic termination clause, the insured both has notice and has substitute insurance: "Written notice of cancellation obviously was not necessary in order for the plaintiffs to have had an adequate

---

coverage in the event that the requisite underlying coverage was not maintained).

**14.** *Compare American Express,* discussed *supra* at 11 and n. 7 (automatic termination provision allowed a third party to cancel an insured's coverage without the insured's consent or knowledge).

**15.** In respects other than liability coverage, the Middlesex policy actually provided superior protection, as it provided comprehensive and collision coverage that was only available under the Ohio Casualty policy to specifically-scheduled vehicles (and the Oldsmobile was not listed on the schedule, and presumably would only have been added to the schedule upon payment of an additional premium).

opportunity to procure other insurance. Indeed, the plaintiffs' purchase of similar insurance from Allstate was the means by which the plaintiffs triggered the policy's automatic termination clause." *Id.* at 93–94, 688 A.2d 1330.

III. Conclusion

As set out above, the automatic termination provision of the Ohio Casualty policy is valid and was triggered by the purchase of the Middlesex policy, resulting in the cessation of the automobile liability coverage on the Oldsmobile by the time of the Siekierski/Gentile accident. In the absence of such coverage, Ohio Casualty has no duty under the automobile liability component of its policy to defend defendants in the state court action. Accordingly,

(1) Plaintiff's motion for summary judgment [Doc. # 42] is GRANTED;

(2) Defendants' motion for summary judgment [Doc. # 56] is DENIED;

(3) The Clerk is directed to enter a judgment in Ohio Casualty's favor declaring that Ohio Casualty Insurance Company has no duty under the automobile liability insurance policy to indemnify or defend Dentek, Inc., Kamilla Siekierski or General Motors Acceptance Corporation with respect to claims by Marie Gentile (individually and as administrator of the estate of John Gentile) arising from the collision of April 15, 2000; and

(4) The Clerk is directed to close this case.

IT IS SO ORDERED.